MILLER v. AHRENS et al.

(Circuit Court, N. D. West Virginia. January 9, 1907.)

No. 583.

**1. COURTS—FEDERAL COURTS—DIVERSE CITIZENSHIP—PARTIES—RESIDENCE.**

Act Cong. March 3, 1875, c. 137, § 1, 18 Stat. 470, as amended by Act March 3, 1887, c. 373, § 1, 24 Stat. 552, and corrected by Act Aug. 13, 1888, c. 866, § 1, 25 Stat. 433 [U. S. Comp. St. 1901, p. 508], requires all civil suits in the federal courts to be brought in the district whereof the defendant is an inhabitant; but sections 5 and 8 declare that suits to enforce any legal or equitable claim upon or claim to, or to remove any incumbrance or lien or cloud on, the title to real or personal property within the district, where such suit is brought shall be an exception to the rule. *Held,* that a complainant in a suit to enforce a claim to certain land and remove a cloud therefrom was entitled to institute such suit in the district in which the property was located and to join therein defendants who were nonresidents of the district.

**2. PARTIES—JOINDER—DEMURRER.**

In a suit to quiet title to certain land and to recover a portion of the proceeds of certain oil taken therefrom and delivered to a certain pipe line corporation, an objection by the latter that it was merely a common carrier, and was not a proper party to the suit, could not be raised by demurrer.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Parties, §§ 150–152.]

**3. WILLS—SUIT TO CONSTRUE—PARTIES.**

Where, in a suit to construe a will creating a testamentary trust, which was attacked as invalid, it was alleged that the trustee had fully executed his trust and sold whatever interest vested in him by the will, the trustee was not a necessary party for the mere purpose of defending the vendor's title.

**4. QUIETING TITLE—FEDERAL PRACTICE—POSSESSION.**

A bill to quiet title will only be maintained in the federal courts where the complainant is in possession.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Quieting Title, §§ 8–11, 44, 45.]

**5. SAME.**

In a suit to quiet title, complainant claimed as residuary legatee certain land which had been conveyed in trust for a religious corporation, which trust complainant claimed to be void. Complainant alleged that testator in his lifetime had executed a lease to defendant A., which at the date of testator's death had been fully complied with and had still 14 years to run. *Held* that, on the theory of complainant's bill, defendant A. was her tenant and his possession was her possession, so as to entitle her to maintain the suit as against A. and his vendees or assignees.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Quieting Title, §§ 44, 45.]

**6. ABATEMENT AND REVIVAL—BILL OF REVIVOR—RIGHTS OF COMPLAINANT.**

Where, in a suit to quiet title, complainant claimed as residuary legatee under a will and died pendente lite, whereupon her daughter filed a bill of revivor, alleging that she was the sole devisee and sole heir at law of her mother, it was immaterial to her right of revivor whether she took as devisee or heir at law.

**7. RELIGIOUS SOCIETIES—FOREIGN CORPORATIONS—GIFTS—STATUTES.**

Const. W. Va. art. 6, § 47 [Code 1906, p. lxiii], provides that no charter of incorporation shall be granted to any church or religious denomination, but that provision may be made by general laws to secure the title to church property, so that it may be held, used, or transferred for the pur-

poses of such church or religious denomination. Code 1899, c. 57, § 1 [Code 1906, § 2606], provides that every conveyance or devise made since January 1, 1777, for the benefit of any church or religious society as a place of public worship or burial place, etc., shall be valid, except that the land shall be held for such purposes, and no other; and section 7 [Section 2613] limits the amount of land that can be so held to 4 acres in an incorporated city, town, or village and not exceeding 60 acres outside of such city, town, or village. Section 30, c. 54, Code 1899 [Code 1906, § 2322], after declaring that any foreign corporation may, "unless it be otherwise expressly provided," hold property and transact business in the state on complying with certain provisions, provides that such corporation shall have the rights, powers, and privileges, and be subject to the same regulations, restrictions, and liabilities, as are conferred and imposed on domestic corporations. *Held*, that a trust created by will for the benefit of a foreign religious corporation, involving a devise of 351 acres of land located in West Virginia, was contrary to the public policy of such state, and invalid.

8. CHARITIES—BENEFICIARIES—CERTAINTY.

Under the laws of West Virginia a devise in trust for the benefit of an association of individuals, who are unnamed and whose membership was not and could not be known, is void for uncertainty, whether it be regarded as a devise or a bequest of personalty.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Charities, §§ 44–50.]

9. WILLS—RESIDUARY LEGATEE—RIGHTS.

Where a devise in trust for a religious society was void, the property so devised passed to the residuary legatee and her heirs, under the express provisions of Code W. Va. 1899, c. 77, § 13 [Code 1906, § 3145].

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 2173, 2181.]

In Equity. On demurrer to bill.

On January 15, 1902, Ann R. Miller, a citizen of Baltimore, Md., filed her bill in this court against George H. Ahrens, James B. Ross, and Henry O'Dell, citizens of New York. George W. Sill, a citizen of Pennsylvania, Curtis S. Barrett, a citizen of Ohio, and the Eureka Pipe Line Company, a corporation of West Virginia, in which she alleges that on September 30, 1895, one Frederick Fickey, Jr., entered into an agreement with defendant Ahrens whereby he leased to him a tract of 351 acres of land owned by him in Ritchie county, W. Va., for the purpose of boring for and producing oil therefrom; that said lease was for a period of 4 years and so long thereafter as oil or gas was found in paying quantities, not exceeding 20 years, said Ahrens to pay a royalty of one-fourth of the oil produced and $100 per year for each gas well; that Ahrens under said lease entered upon said land, bored wells, which have and are producing large quantities of oil and gas, and up to the time of Fickey's death delivered into the defendant pipe line company's pipe line one-fourth of the oil to said Fickey's credit; that on February 21, 1898, said Fickey died testate in Baltimore, and his last will and testament was there duly probated and recorded, and subsequently recorded in the county court clerk's office of Randolph county, this state; that by said will said Fickey devised and bequeathed to plaintiff, his sister, "all the rest and residue of his estate, real and personal, wherever situate," whereby she charges she became seised at the date of his death in fee simple of all his real estate not otherwise legally disposed of by his said will; that by said will said Fickey attempted to devise the said tract of 351 acres in Ritchie county and about 6,000 other acres in Randolph county, W. Va., to one Frank Woods, of Baltimore, Md., as trustee, in trust to sell at public or private sale and pay over the proceeds of such sale, less taxes and expenses of sale, "to the First Spiritualist Church of Baltimore City, a corporation created under the laws of the state of Maryland and existing in Baltimore city"; that said Woods made pretended or attempted sale of said 351 acres in Ritchie county on June 7, 1899, to defendant Ahrens, and

attempted to convey same to him, which conveyance, with a copy of said will of Fickey, Ahrens caused to be recorded in Ritchie county on September 4, 1899, and on August 26, 1899, he (Ahrens) conveyed to defendants Ross, O'Dell, Sill, and Barrett an undivided three-fourths interest in said land. She thereupon charges that said "First Spiritualist Church of Baltimore" is, and was at the date of said will and of Fickey's death, a religious institution organized to propagate certain religious beliefs and practices, and was incapable of taking said lands or the proceeds thereof by devise or bequest under the laws of West Virginia; that said devise to Woods as trustee for said church organization was null and void, passed no title or estate to either said Woods as trustee, said church organization, or to the purchaser (Ahrens), but that all title, legal and equitable, to said land vested in plaintiff as residuary legatee and devisee, notwithstanding said Ahrens, Ross, O'Dell, Sill, and Barrett claim ownership of said land and refuse to account for or deliver to her the one-fourth of oil produced therefrom and due under the lease, and that said pipe line company has wrongfully since said pretended purchase delivered all the oil produced from the land to them; that the claims of said defendants Ahrens, Ross, O'Dell, Sill, and Barrett to ownership in said land cast a cloud over her title thereto and obstructed her in the sale thereof. The prayer of the bill is substantially for, first, a construction of the will and a judicial determination of the invalidity of said devise to Woods, trustee, for the benefit of said Spiritualist church; second, to set aside as cloud upon her title the deed of Woods, trustee, to Ahrens, and the deed of Ahrens to Ross, O'Dell, Sill, and Barrett; third, for an accounting of the value of oil and gas received by defendants and not paid over to her by them since the death of Fickey. To this bill the defendants Ahrens and O'Dell entered at rules their demurrer, and on January 16, 1903, the plaintiff joined therein, and it was set down for argument.

On May 23, 1903, Mary Virginia Miller appeared and tendered her bill, in which she sets forth that since the institution of the suit Ann R. Miller, the original plaintiff, had departed this life testate, and by her will bequeathed and devised all of her estate to her, the said Mary Virginia Miller, her daughter and sole heir at law; that also the defendant Geo. W. Sill had died since the institution of the suit. She prays the cause to be revived in her name as plaintiff, as the sole heir at law, devisee, and legatee of Ann R. Miller, and that the personal representatives and heirs of said Sill, who are named, be made parties defendant. On January 19, 1904, the defendants Wm. Schur and F. E. Hertzel, executors of George W. Sill, deceased, Augusta Sill, Ahrens, O'Dell, and Barrett demurred to this bill of revivor, and on November 10, 1904, the plaintiff confessed this demurrer so far as it alleged Geo. W. Sill to have been dead at and prior to the institution of the original suit, and thereupon tendered and asked leave to file a bill, in the nature of a bill of revivor and an amended bill, bringing in the personal representatives and heirs of Sill as new parties to the suit. This bill was ordered filed, and to it the same defendants, January 13, 1905, demurred. Meanwhile the Eureka Pipe Line Company had entered at rules its demurrer and answer to the original bill, and also filed its demurrer and answer to the amended bill and bill of revivor. By its answers it sets forth the quantities of oil, something over 29,000 barrels, taken from the Ritchie land since the death of Fickey and discharged into its line; but at this time it is unnecessary to consider this matter, as the sole questions involved in this hearing arise upon the demurrers entered by the defendants. That of the Eureka Pipe Line Company is to the effect that it is not a necessary or proper party, because it is a corporation common carrier and storer of oil, required to receive, transport, and store all oil upon request or demand of any person or producer in possession, and therefore is not liable to be sued or held responsible for oil so delivered into its lines as such common carrier. The several demurrers of the principal defendants for grounds allege: (a) Want of jurisdiction; (b) want of proper and necessary parties; (c) want of proper showing of interest in Mary Virginia Miller, the daughter seeking to revive and recover under the will of her mother, the original plaintiff; (d) that plaintiff has a complete remedy at law; (e) that under the law said bills present no cause of action.

Maynard F. Stiles, for plaintiff.
Harry P. Camden, for defendants.

DAYTON, District Judge (after stating the facts as above). Inasmuch as the determination of these demurrers may be largely decisive of the controversy, they have been most ably and exhaustively argued by counsel both orally and by briefs. They have presented some very close and perplexing questions to my mind, and their consideration has required on my part much time, study, and thought. For convenience sake, I shall not take them up for consideration in the exact order set forth above, but will determine them in what appears their relative importance from the standpoint of perplexity and difficulty.

Of course, it is absolutely necessary to determine whether or not this court has jurisdiction of the controversy by reason of the diverse citizenship of the parties. The demurrer admitting the allegations of the bills to be true, it is to be assumed that the original plaintiff and her daughter, now seeking to revive, were, and the latter is now, a citizen of the state of Maryland; that the defendants are all citizens of the state of New York, Ohio, and Pennsylvania, except the defendant pipe line corporation, created under the laws of the state of West Virginia, but which denies its interest or responsibility in any way to the plaintiff as a common carrier simply of the oil derived from the land. Whether this be true or not, it is true that no liability on its part to the plaintiff can attach unless the really true and essential question of the ownership of the land be first decided in the plaintiff's favor; and this is a question arising wholly between the plaintiff, a citizen of Maryland, and these defendants, as citizens of Pennsylvania, Ohio, and New York. Therefore the collateral and conditional controversy that may or may not arise between the plaintiff and this corporation would not ordinarily, it seems to me, alone furnish ground for jurisdiction because of the diverse citizenship of the plaintiff as a nonresident and this corporation as a resident of the state. It certainly would not afford jurisdiction to this court to settle the main controversy that arises between this plaintiff, a citizen of Maryland, and Ahrens and his assignees, all of whom are nonresidents of this state and district, under the express inhibition of Act March 3, 1875, c. 137, § 1, 18 Stat. 470, as amended by Act March 3, 1887, c. 373, § 1, 24 Stat. 552, and corrected by Act Aug. 13, 1888, c. 866, § 1, 25 Stat. 433 [U. S. Comp. St. 1901, p. 508], requiring all civil suits to be brought in the district whereof the defendant is an inhabitant. However, to this general inhibition express exception is made by Act March 3, 1875, c. 137, § 8, 18 Stat. 472 [U. S. Comp. St. 1901, p. 513] and by Act Aug. 13, 1888, c. 866, § 5, 25 Stat. 436 [U. S. Comp. St. 1901, p. 515], of suits "to enforce any legal or equitable lien upon or claim to, or to remove any incumbrance or lien or cloud upon, the title to real or personal property within the district where such suit is brought." These sections confer a privilege upon the plaintiff of joining in local actions defendants who are nonresidents of the district, as expressly held in such cases as Greeley v. Lowe, 155 U. S. 58, 15 Sup. Ct. 24, 39 L. Ed. 69; Mellen v. Moline Iron Works, 131 U. S. 352, 9 Sup. Ct. 781, 33 L. Ed. 178; Good-

man v. Niblack, 102 U. S. 556, 26 L. Ed. 229. That the allegations of the bills here clearly bring this controversy within the exceptions provided by these sections I think cannot be questioned. The suit is distinctly one "to enforce * * * claim to or [and] remove incumbrance or lien or cloud upon the title to real * * * property within the district where such suit is brought," and therefore objection to jurisdiction because of nonresidence of the defendants in this district must be overruled.

The next question that we will consider is the objection to parties. The pipe line corporation insists it is not a proper and necessary party. The defendant Ahrens and his alienees insist the "First Spiritualist Church of Baltimore" and Frank Woods, its trustee, are absolutely necessary parties. As to the objection made by the pipe line corporation to its being made a party improperly, it seems to me that this objection cannot be raised by demurrer. This court cannot take judicial notice, simply from its charter as a common carrier, of the liability of this pipe line company under the contract expressly made, or that may be implied under the particular facts of this case, between it and the lessee, Ahrens, or the plaintiff, if she shall be held entitled to said land and to an accounting under the oil lease, as prayed for by her. Such matters will arise solely upon the facts that may develop in the case, provided she be held to have right and to maintain it in this court and this proceeding. It may turn out in the end that this company may, by reason of its connection with the reception, transportation, and sale of the oil in controversy and its peculiar knowledge of its amount and value, be held proper, although not an absolutely necessary, party; but, I repeat, this depends upon the facts in the case, and cannot arise upon the demurrer, and I must therefore hold that the grounds of such demurrer by this corporation are not well taken.

The objection raised by Ahrens and others to these bills for want of proper and necessary parties, to wit, "the First Spiritualist Church of Baltimore" and Frank Woods, trustee, I have had a very great deal of trouble to determine. Its importance in this controversy can be seen at a glance. This church corporation and Woods, trustee, were at the time of the institution of this suit residents of Baltimore, Md., in which city and state the original plaintiffs, Ann R. Miller, and her daughter, Mary Virginia Miller, now seeking to revive the cause in her name as plaintiff, were resident. The church corporation and Mary Virginia Miller are so still resident, while it is admitted that Woods died such resident before the institution of this suit. Therefore, if I should hold that either or both the church corporation and Woods were necessary parties, the diversity of citizenship is at once destroyed; for their interests, if they had any, would necessarily be antagonistic to those of the Millers, so that they could not be ranged as plaintiffs with them, and the jurisdiction of this court over this controversy would immediately end. On behalf of demurrants it is earnestly insisted that the crucial object and prime purpose of these bills is to construe the will of decedent, Fickey; that such construction cannot be had against the interests of the very parties beneficiary under the clause assailed; that it is their inherent right to be before the court, to maintain and urge

that construction of the will that will secure to them the benefit of the devise assailed. On the other hand, it is just as earnestly insisted that Woods was simply a trustee, acting in a ministerial capacity, who had, prior to the institution of the suit, fully performed all the powers and duties involved in his trusteeship, by reason of his sale of the land in controversy and his conveyance by deed thereof to the purchaser, Ahrens, and therefore he was a wholly unneccessary party; that the "First Spiritualist Church of Baltimore" could not be made a party, because, under the Constitution and laws of West Virginia it cannot be in any manner recognized as having a corporate existence, and, if it could even be so recognized, that the suit is inherently and essentially one, not to determine any interest of such church corporation in the property, but, by reason of the absolute nullity of the devise to its trustee in the will and the absolute validity of the residuary clause in the will in Ann R. Miller's favor, to establish fee-simple title in the land in her daughter, her sole heir at law and devisee; that, therefore, the church organization, through its trustee, having sold and by deed of record conveyed all of the right, title, and interest it had, if it had any, its only interest in this controversy would be its possible liability to refund to the purchasers the purchase money paid to its trustee for its benefit under the possible terms and conditions of warranty in the deed made by such trustee to said purchasers; and that in this controversy, wholly collateral, the plaintiff, Miller, could have no possible interest or concern, and therefore she cannot, on its account, be required to make in any event this church corporation a party, and thereby destroy her very right of action in this court against the true parties claiming interests antagonistic to her own.

The proposition that the church corporation cannot be made party, because its corporate existence cannot be recognized under the Constitution and laws of this state, is so involved in that part of this demurrer that alleges that under the law these bills present no cause of action that I will defer its consideration until later in connection with that point. For the present I will, upon the assumption that the church corporation could be made a party, consider whether it and its trustee must be held necessary parties. It would seem that the question, so far as it involves the church corporation, might be determined under equity rule 49, which reads as follows:

"(49) In all suits concerning real estate, which is vested in trustees by devise, and such trustees are competent to sell and give discharges for the proceeds of the sale, and for the rents and profits of the estate, such trustees shall represent the persons beneficially interested in the estate for the proceeds, or the rents and profits, in the same manner, and to the same extent as the executors or administrators in suits concerning personal estate represent the persons beneficially interested in such personal estate; and in such cases it shall not be necessary to make the persons beneficially interested in such real estate, or rents and profits, parties to the suit, but the court may upon consideration of the matter on the hearing, if it shall so think fit, order such persons to be made parties."

This however, would seem only to enforce the necessity of Woods, as trustee, being made a party, and therefore would not relieve the situation so far as plaintiff is concerned. The question, then, recurs to the original proposition as to whether this trustee, having fully exe-

cuted his trust, having sold whatever interest vested in him by said will to Ahrens, and having by deed, executed, acknowledged, and recorded, conveyed such interest to the latter, shall be required to be made a party and to defend his vendee's title. And in this question is involved that other ground of demurrer that the plaintiff cannot maintain this suit in equity because she has a complete and adequate remedy at law.

I think it may be conceded that the true purpose of this suit is to have the clause of this will in favor of the church corporation declared on its face null and void and not to have any interest of such church in the property ascertained. The clause is not claimed to be ambiguous requiring judicial construction. The clear-cut position is taken that the church corporation cannot in law be recognized as an entity capable of taking and holding as such, and, further, the devise cannot be held good to it as an unincorporated association for lack of certainty. Standing upon this proposition, the plaintiff, then, in effect asserts that the defendants have possession, have taken conveyance from the church's trustee of legal title, and she seeks to destroy this legal title. If this were a suit to settle the estate of Fickey and distribute its effects among the several legatees and devisees, then there would be no question but what Woods, as the trustee, at least, would have to be a party, and probably the church corporation also, provided it could by our laws be recognized as such corporation. But I do not regard this as the object of this suit. On the contrary, it admits practically the settlement of the estate in Maryland, and charges substantially the discharge fully of all his trust duties by Woods by the sale and conveyance to Ahrens. It narrows itself down, therefore, to an action to establish the plaintiff's title to this land and destroy the title of Ahrens and his vendees to it. Unquestionably such remedy would have ordinarily to be sought in a court of law by the action of ejectment. In such action of ejectment it would not be contended for a moment, I take it, that plaintiff would have to make any other parties defendant than those in possession claiming possession adverse to her—in other words, Ahrens and his vendees. In such action, upon introduction of the respective claims of title, it would at once develop that plaintiff claimed under the residuary clause of this will and the defendants under the devise to Woods, trustee, which would be assailed as void upon its face. The trial judge would necessarily have the question to determine, and in so doing would doubtless settle the issues involved. What excuse, therefore, is there for this suit in equity?

It is now well settled, as a matter of federal practice, that bills to quiet title will only be maintained where the plaintiff is in possession. Whitehead v. Shattuck, 138 U. S. 146, 11 Sup. Ct. 276, 34 L. Ed. 873. The plaintiff here, however, sets up the fact that her testator, in his lifetime, had made and executed a lease to defendant Ahrens, which up to the time of his death had been fully complied with and still had 14 years to run. If her pretensions are true, she took testator's title to this land subject to this lease, and under it Ahrens became her tenant, and his possession is her possession, and I think it clear that she has right, as against such tenant and his vendees or assignees, to maintain her bill to quiet her title against any conveyance of title ad-

verse to hers which he may seek to take or have taken before he has fully surrendered to her all his possession under his lease. Had the conveyance from Woods been taken, and possession obtained by a stranger, it would have been different, and this action could not probably have been maintained in equity. This view, I think, is well settled by elementary principles defining the rights and obligations of landlords and tenants. Further, it seems to me that, the equitable remedy to quiet title being essentially similar to the legal action of ejectment to determine title within the limited sphere in which it can be resorted to, by parity of reason the parties required to the respective actions would be governed by the same general rules, and hence, if this clause of the will in favor of the church corporation is void, and plaintiff has good title under the residuary clause, this suit to quiet such title and remove clouds thereon will not require other than Ahrens and his vendees to be made parties to it. It is the conveyances to them, and to them alone, that constitute such clouds.

It is not necessary to dwell but a moment upon that ground of demurrer alleging that Mary Virginia Miller, in her bill of revivor and amended bill, has not shown her interest in and right to take under the will of her mother, Ann R. Miller. I think this ground not well taken, because I must assume her declarations made in this bill to be absolutely true, and in it she charges herself to be sole devisee and sole heir at law of her mother. Under such circumstances it is immaterial whether she take as devisee or heir at law. If she is not such, it will be a matter of fact to be established by her after its denial is made by answer of defendants.

This brings us at last to the final and most difficult question of determining whether or not the devise of this land by Fickey to Woods, trustee, for the benefit of the "First Spiritualist Church of Baltimore," is null and void on its face, as against public policy of the state or for uncertainty. The defendants have squarely raised this question by alleging in their demurrer that plaintiff's bills present no cause of action.

On behalf of the plaintiff it is contended that this devise is void: First. Because the beneficiary cannot be recognized as having a legal corporate existence by the laws of this state. Second. Because, aside from its corporate existence, the beneficiary is uncertain. Third. Because the tract of land sought to be devised exceeds the quantity that may be acquired for a church or religious denomination or body. Fourth. Because land cannot be taken for a church by trustees by devise. Fifth. Because the devise is contrary to the public policy of the state.

On the contrary it is earnestly and ably contended by defendants: First. That this church organization is in fact a legally constituted corporation under the laws of Maryland authorizing such, capable of taking by devise or bequest under such, and therefore, under the law of comity existing between the states, must be recognized as such foreign corporation and allowed to take under this will this land. This is alleged to be true because: (a) While religious bodies may not be incorporated in West Virginia under its Constitution and laws, there is no inhibition against such a body, legally incorporated under the

law of another state, taking and holding real estate in this state. (b) On the contrary, the very clause of the Constitution of the state (section 47, art. 6 [Code 1906, p. lxiii]) which prohibits incorporation grants to the Legislature power to enact laws securing the title to church property, for its sale and transfer, for the use and purposes of such church. (c) Because the English statutes of mortmain were never adopted in West Virginia. (d) In lieu of the statute of Elizabeth, repealed about the year 1790, in Virginia, we have section 1, c. 57, of our Code (section 2606, Code 1906), confirming every conveyance of land hereafter made to any church, as a place of worship, burial place, or minister's residence. (e) Because section 30, c. 54, of the Code (section 2322, Code 1906), expressly provides that any corporation incorporated under the laws of any other state or territory, unless it be otherwise expressly provided, may hold property and transact business in this state upon complying with certain provisions therein set forth. (f) The Constitution and statute both allowing foreign corporations to take and hold property unless otherwise expressly provided, and it not being otherwise expressly provided, therefore a foreign religious corporation can take under this statute and the rule of comity. (g) Prior to St. 32 Henry VIII there was no general power at common law to devise lands as such a power would have opposed the feudal policy of holding lands inalienable without the consent of the lord. The statute of wills is, therefore, an enabling act. Under the West Virginia statute, the right to devise to corporations is given without limitation. Second. If it be contrary to public policy, which, however, is denied, for a religious corporation to transact business in West Virginia, and consequently to take and hold real estate, a grant or devise in contravention of this public policy is not null and void, so as to make the deed or will inoperative to convey title to the religious corporation; but the effect of such conveyance or devise is to convey the title to the religious corporation, subject to be escheated or forfeited by the state by proper proceedings, and such devise would not fall within the residuary clause of the will as property undisposed of. Third. The devise in question is not of real estate, but by equitable conversion is personal property. It is made to an individual trustee, is not void for uncertainty, and is analogous to one made to a trustee to be sold for the benefit of an alien prior to the enabling acts allowing aliens to hold real estate. Fourth. It never was contrary to public policy, even under the feudal system, for corporations to take and hold personal property; and it is not against public policy in West Virginia for any corporation, religious or otherwise, to take and hold such personal property.

Before determining these propositions, which must necessarily depend upon the construction to be given certain constitutional and statutory provisions existing in this state, where the land in controversy is situate, it will be well for us to bear in mind that "the reason of the law is the life of the law." That reason for it may not be, and usually is not, so apparent now, as it was at the time when enacted. No more striking illustration can be found of the dogged determination, bred in the bone, of the Anglo-Saxon to hold on, at any cost and against

any and all odds, to the soil, the land of his native England, than will be found in the history of his long struggle against the church, which, forgetting its true mission, and dazzled by the power which large possessions gave, yielded to the temptation of seeking vast domain through the "dead hand," through devises made by men recognizing that the last hour had come, terrified by the nearness of eternity, seeking by such devises to the church to make their peace with God. Following the provisions of Magna Charta 20 distinct statutes of mortmain have been placed upon the statute books of England as evidence of the bitterness of this long struggle, which more than any other cause led to the English Reformation and the Puritan domination under Cromwell. The Virginia colony was perhaps more strongly imbued with these principles of opposition to church aggrandizement, as illustrated by the growth in worldly possessions and power of the Papacy, than any other of the colonies. Her people were more peculiarly identified with and part of the old Anglo-Saxon English stock. Hence it was that when Sir George Calvert, Lord Baltimore, the Catholic who had by his genius and merit made himself a peer, a member of the Privy Council, and the confidant of kings, came with his family and 40 colonies from the cold and forbidding shores of Newfoundland to Jamestown in 1629, he received a very hostile reception. They required him to take the oath, not alone of allegiance, but also of supremacy, which placed the King as supreme in "all spiritual and ecclesiastical things"— an invention of Elizabeth's time, intended as a safeguard against those suspected of treasonable designs. They drove him out, and, when he sought to establish a colony south of the James, they still objected. Hence it was he finally secured the charter for the palatinate of Maryland, in the unsettled region north of the Potomac, where an asylum at last was created for those of his faith, who could receive but scant welcome elsewhere. This intense opposition to church power did not diminish in Virginia. In her Bill of Rights and Constitution of 1776 (section 16) she declared that religion "can be directed only by reason and conviction," and forbade all ministers of the gospel from being elected members of either House of Assembly or the Privy Council. Her Legislature did incorporate the Episcopal Church, then repealed the act of incorporation, and at last passed (December 16, 1785) that remarkable act, too long to quote, which not only established religious freedom, but in its preamble attempted to define what such freedom would be. In 1819 Chief Justice Marshall rendered the opinion in Baptist Association v. Hart, 4 Wheat. 1, 4 L. Ed. 499, a case arising in Virginia, in which he reviews the Virginia policy, in connection with that of England, especially under St. 43 Eliz., and held a devise to the "Baptist Association" void as such to a voluntary association and as a charity, holding courts of equity to have no power to administer such charities. In Gallego's Ex'rs v. Attorney General, 3 Leigh, 450, 24 Am. Dec. 650, Judge Tucker, has stated the views entertained in Virginia in a passage that has become famous in her courts and those of this state, and the views of which may be regarded as expressing the spirit and purpose of our legislation upon this subject to-day. He says:

"No man at all acquainted with the course of legislation in Virginia can doubt for a moment the decided hostility of the legislative power to religious

incorporation. Its jealousy of the possible interference of religious estab-
lishments in matters of government, if they were permitted to accumulate
large possessions, as the church has been prone to do elsewhere, is doubtless
at the bottom of this feeling. The Legislature knows, as was remarked by
counsel, that wealth is power. Hence the provision in the Bill of Rights;
hence the solemn protest of the act on the subject of religious freedom; hence
the repeal of the act incorporating the Episcopal Church, and of that other act
which invested the trustees appointed by religious societies with power to
manage their property; hence, too, in part, the law for the sale of the glebe
lands; hence the tenacity with which applications for permission to take prop-
erty in a corporate character (even the necessary ground for churches and
graveyard) has been refused. The Legislature seem to have been fearful that
the grant of any privilege, however trivial, might serve as an entering wedge
to greater demand. Nor did this apprehension of the dangers of ecclesiastical
establishment spring up for the first time with our republican institutions.
The history of ages had attested the proneness of such establishment to vast
accumulations of property, and the statute book of England is loaded with stat-
utes of mortmain, which were rendered necessary by the rapacity of the clergy,
at least in the early periods of the church. So long as there have been church
establishments, with power to receive and accumulate property, so long has
the tendency to such accumulation been manifested distinctly. The history
of the Papal See, and of the religious houses under its dominion is but a
history of the cupidity of monks and devotees, veiled under the sacred garb
of our holy religion. The vast domains of the clergy acquired by the Catholic
establishment of France are known to us all. From this fatal source, among
others, sprung a revolution which deluged the fairest country in Europe in
blood, and its horrible progress spread desolation over adjoining states and
shook the civilized world to its center. And in Protestant England, fenced
around as it has been with mortmain acts, we see a church establishment pos-
sessed of overgrown wealth and power, less devoted to the cause of genuine
religion than to pamper the luxury and indolence of the high dignitaries of
the church. With these examples before our eyes, it is not wonderful that
our statesmen have been cautious. They have been wise in their caution.
The evil has not sprung from particular creed, or the peculiarities of a con-
fession of faith. It grows out of the very nature of the thing. The church
if made capable to take, while it is continually acquiring, from the liberality
of the pious, or the fears of the timid, or the credulity of the ignorant, never
can part with anything; and thus, like those sustaining powers in mechanics,
which retain whatever they once have gained, it advances with a step that
never retrogrades. The natural cupidity of the human heart is watched by
the devotee himself with the less jealousy in his pursuit after acquisitions for
the church, since he believes it to be purified from the dross of selfishness and
sanctified by the holy object of his ambition. Thus it is that, however humble
in its beginning, accumulation is the natural result of the power vested in any
religious society to acquire property. The same influence which enables it to
gain from the state its first insignificant privileges will secure to it from time
to time new, though apparently inconsiderable, accessions, until at last the
power will be acquired which legislative jealousy has apprehended. Prop-
erty, indeed, it need not ask of the Legislature. The power to take and ac-
cumulate alone is necessary. All time has shown that the influence of feelings
of devotion will do the rest. I speak of those feelings which exist without
any undue influence from the pastor of the society. But, if we go farther,
and suppose it possible that those abuses which have once existed may exist
again, the progress will be more rapid, though not more certain. 'What (says
the accomplished Sir Samuel Romilly) is the authority of a guardian, or even
of a parent, compared with the power of religious impressions under the
ascendancy of a spirtual adviser, with such an engine to work upon the pas-
sions, to inspire (as the object may be promoted) despair or confidence, to
alarm the conscience by the horrors of eternal misery, or support the drooping
spirit, by unfolding the prospect of happiness which is never to end.' Such I
conceive, are the general grounds upon which rests the legislative policy, in
relation to the power of acquiring and holding property by religious societies.
We have seen, too, a similar policy evinced as to charities generally, in

striking at the root of them all by the repeal of the statute of Elizabeth. It is not (to use the language of one of the counsel) that charity is banished from Virginia. Its benign and salutary influence may warm and animate every heart, and lead to generous munificence, as the daily habit of our lives, without exposing the state to the evils which have always flowed from what are called 'conveyances in mortmain.'"

Without setting forth in detail the course of legislation touching this matter, it is sufficient to say that in the Constitution of Virginia, adopted in 1851 (article 4, § 32) it was provided:

"The General Assembly shall not grant a charter of incorporation to any church or religious denomination, but may secure title to church property to an extent to be limited by law."

In the Constitution of 1863 of this state (article 11, § 2) was this provision:

"No charter or incorporation shall be granted to any church or religious denomination. Provision may be made by general laws for securing the title to church property, so that it shall be held and used for the purpose intended."

The present Constitution of the state (article 6, § 47) provides:

"No charter of incorporation shall be granted to any church or religious denomination. Provision may be made by general laws for securing the title to church property, and for the sale and transfer thereof, so that it shall be held, used or transferred for the purposes of such church or religious denomination."

The Legislature of this state by chapter 33, p. 48, of the Acts of 1882, now chapter 57 of our Code of 1906, enacted by section 1:

"Every conveyance, devise or dedication which has been made since the first day of January, one thousand seven hundred and seventy-seven, and every conveyance of land which shall hereafter be made for the use or benefit of any church, religious sect, society, congregation or denomination, as a place of public worship, or as a burial place, or as a residence for a minister, shall be valid, and shall be construed to give the local society or congregation of such church to whom it was so conveyed, devised or dedicated, the control thereof, except as herein provided; and the land shall be held for such purpose and no other."

And by section 7 [Code 1906, § 2613]:

"Such trustee may take and hold, for the purposes mentioned in the first section of this chapter, not exceeding four acres of land in an incorporated city, town or village, and not exceeding sixty acres out of such city, town or village."

Coming, now, to the propositions set forth by defendants in support of their demurrer, it is clear that these laws of this state expressly forbid the incorporation of church organizations; expressly forbid the holding by such organization, through trustees, of real estate for any other than three specific purposes, as a place of worship, a burial place, and a place of residence for its minister; and the holding for such purposes is limited to 4 acres in incorporated cities and towns and 60 acres outside. This being true, is it possible for a nonresident religious corporation, existing under laws of other states, by reason of the law of comity, to exercise rights and powers in this state expressly prohibited to similar organizations in our state? It is not to be forgotten that not only these churches cannot be incorporated under our laws, but as vol-

untary associations they are limited to taking and holding for specified purposes and amounts. The very purpose of the law, I take it, is clearly to carry out the old established public policy of preventing the acquisition by these associations of property and power so clearly set forth by Judge Tucker; and to accomplish this public policy, so long and consistently maintained, these laws should be construed broadly and liberally, not narrowly and technically. It is not to be forgotten that corporations are purely creatures of law, and can have no power beyond that of the law which gives them birth. Chief Justice Taney in Bank v. Earle, 13 Pet. 519, 10 L. Ed. 274, has thus expressed it:

"It is very true that a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created. It exists only in contemplation of law, and by force of the law; and where that law ceases to operate, and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation and cannot migrate to another sovereignty."

As stated in Kirven v. Virginia-Carolina Chemical Company (C. C. A.) 145 Fed. 288, 292:

"By the comity existing between the states and with other countries these corporations are permitted to do business in other states than their own, but always subject to the laws of the domestic state, which has the power at any time to restrict their operations and even expel them from its limits. They are not 'citizens,' within the meaning of article 4, § 2, of the federal Constitution, entitling them 'to all privileges and immunities' as such 'in the several states.' Nor do they come under the protection of section 1 of the fourteenth amendment, prohibiting the abridgement of such privileges and immunities"— citing Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357; Liverpool Ins. Co. v. Massachusetts, 10 Wall. 566, 19 L. Ed. 1029; Bank v. Earle, 13 Pet. 519, 10 L. Ed. 274; and numerous other cases.

But, if this were not so, I think our statute (section 30, c. 54, Code [section 2322, Code 1906]) is clearly decisive of the matter. After setting forth that any foreign corporation may, unless it be otherwise expressly provided, hold property and transact business in this state, upon complying with certain provisions set forth, it then says:

"Such corporation so complying shall have the rights, powers and privileges, and be subject to the same regulations, restrictions and liabilities, that are conferred and imposed by this and the fifty-second, the fifty-third and the thirty-second chapters of this Code as amended by this act, on corporations chartered under the laws of this state."

These chapters of the Code referred to in this provision (the fifty-second, fifty-third, fifty-fourth, and thirty-second) contain the laws of the state relating to the formation, regulation, and government of the public corporations and joint-stock companies of the state. They expressly set forth the purposes for which corporations can be formed and the extent of the powers conferred on such. No such power to a church organization to incorporate and take, hold, and sell real estate is, of course, conferred in these laws; for to do so would violate the Constitution and the statute heretofore cited. Here, then, is in effect a direct statutory inhibition against this nonresident church corporation assuming or attempting to exercise other powers and receiving other privileges than could be exercised by resident ones, and I am driven to the conclusion that I cannot recognize, under our laws, this "First Spiritualist Church of Baltimore" as a corporation, or as any

other than a voluntary association "organized for the purpose of promoting and propagating certain religious beliefs and practices."

Having reached this conclusion, the tangled skein will unravel itself quickly. This device for the benefit of an association of individuals unnamed, who may increase and add to its number to-day, lose by death and withdrawal to-morrow, whose membership is not known and is undeterminate, must be held void for uncertainty under a long line of decisions, such as, Baptist Association v. Hart, 4 Wheat. 1, 4 L. Ed. 499; Kain v. Gibboney, 101 U. S. 362, 25 L. Ed. 813; Gallego's Ex'rs v. Attorney General, 3 Leigh (Va.) 450, 24 Am. Dec. 650; Brooke v. Shacklett, 13 Grat. (Va.) 301; Bible Society v. Pendleton, Trustee, 7 W. Va. 79; Carskadon v. Torreyson, 17 W. Va. 43; Pack v. Shanklin, 43 W. Va. 304, 27 S. E. 389. It may be noted in passing that the Supreme Court of the United States has distinctly held differently in passing upon this class of devises under the laws of other states, and Justice Gray has in Russell v. Allen, 107 U. S. 167, 2 Sup. Ct. 327, 27 L. Ed. 397, said:

"And the only cases in which this court has followed the decisions in Baptist Association v. Hart have, like it, arisen in the state of Virginia, by the decision of whose higher court charities, except in certain cases specified by statute, are not upheld to any greater extent than other trusts."

While this is true, the Supreme Court has, in passing upon such bequests made under the laws of Virginia, which are substantially ours in this particular, and whose decisions touching this question have been followed and fully affirmed by those of our Supreme Court of Appeals, in every case upheld and enforced the law as enunciated by the state court of last resort. Section 1, syllabus of Kain v. Gibboney, supra.

Further decision of the points raised by demurrers is unnecessary. That to the effect that the devise is to a trustee, and is in equity converted into personalty, is not tenable under the ruling in Carskadon v. Torreyson, supra, where the trusts are set aside, not because the trustees are uncertain, but because the cestuis que trust were vague, indefinite, and uncertain; and bequests of personalty, as well as devises, are uniformly by these decisions held void for uncertainty. Section 3145, Code 1906 (section 13, c. 77, Code 1899) provides:

"Unless a contrary intention shall appear by the will, such real estate or interest therein as shall be comprised in any devise in such will, which shall fail or be void, or otherwise incapable of taking effect, shall be included in the residuary devise (if any) contained in such will; and if there be no residuary devise therein, such real estate or interest shall go to the heirs at law of the testator, as if he had died intestate."

In this will of Fickey, this clause devising this land to Woods, trustee, for the benefit of the First Spiritualist Church of Baltimore, is void for uncertainty. There is a residuary clause in the will in favor of his sister, Ann R. Miller, of whom her daughter, Mary Virginia Miller, is sole heir at law and sole devisee. She is entitled, therefore, to have this cause revived in her name as such, and the demurrers must be overruled.