## WEST VIRGINIA PULP & PAPER CO. et al. v. MILLER.

(Circuit Court of Appeals, Fourth Circuit. November 5, 1909.)

No. 894.

1. CONVERSION (§ 15*)—RELIGIOUS SOCIETIES (§ 16*)—DIRECTIONS IN WILL—DEVISE IN TRUST FOR SALE AND DISPOSITION OF PROCEEDS.

A testator devised certain lands in West Virginia to a trustee "to have and to hold * * * in fee simple, upon trust nevertheless to sell and dispose of said lands at public or private sale * * * and pay over the proceeds of such sale * * * to the First Spiritualist Church of Baltimore City, a corporation created under the laws of Maryland." *Held*, that the will worked an equitable conversion of the land into money, and that the constitutional and statutory provisions of West Virginia, limiting the amount of land which a religious denomination could own or hold, did not affect its validity.

[Ed. Note.—For other cases, see Conversion, Cent. Dig. § 30; Dec. Dig.. § 15;* Religious Societies, Cent. Dig. § 104; Dec. Dig. § 16.*]

2. RELIGIOUS SOCIETIES (§ 16*)—TRUST FOR BENEFIT OF RELIGIOUS CORPORATION—SCOPE OF STATE LAWS.

The constitutional and statutory provisions of West Virginia prohibiting the holding of land by any church or religious denomination were not intended to, and could not if they were so intended, affect the right of an owner of land in that state to convey or devise it in trust for sale for the benefit of a foreign religious corporation.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. § 104; Dec. Dig. § 16.*]

3. WILLS (§ 70*)—VALIDITY OF BEQUESTS—WHAT LAW GOVERNS.

The validity of a bequest of money or personal property, where the testator and the legatee are both citizens of the same state, is to be determined entirely by the laws of such state.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 184, 185; Dec. Dig. § 70.*]

4. CONVERSION (§ 21*)—ESTATES IN TRUST WITH POWER OF SALE—EFFECT OF EXECUTION OF POWER.

Where a testator devised lands to a trustee with directions to sell the same, after the trustee has exercised such power in good faith, a subsequent contestant of such devise cannot attack the validity of the sale, but can only pursue the proceeds.

[Ed. Note.—For other cases, see Conversion, Cent. Dig. § 56; Dec. Dig. § 21.*]

Appeal from the Circuit Court of the United States for the Northern District of West Virginia, at Parkersburg.

Suit in equity by Mary Virginia Miller against the West Virginia Pulp & Paper Company and the West Virginia Spruce Lumber Company. Decree for complainant, and defendants appeal. Reversed.

This is an appeal from a decree of the Circuit Court of the United States for the Northern District of West Virginia. The subject-matter of this suit is an undivided $8/17$ interest in 8,405 acres of timber land in Randolph county, W. Va. The appellants hold without dispute an undivided $9/17$ interest therein or in the timber thereon and claim the fee-simple title to the undivided $8/17$ here in controversy. The appellee filed her bill to cancel and annul the title of the appellants, to enjoin them from cutting timber upon any portion of the premises, and to compel an accounting for the timber already cut.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

The court entered a decree granting the relief prayed for in the bill.

The material facts are as follows:

On the 21st day of February, 1899, Frederick Fickey, Jr., died in Baltimore City, the place of his residence, seised and possessed of the property in suit. His will was probated on the sixth day after his death, and clauses 4 and 6, which are material to the present controversy, are as follows:

"(4) I bequeath and will to my friend, Frank Woods of Baltimore City, trustee, upon the trust hereinafter set forth, the following three parcels of real estate, situate in the state of West Virginia, viz.: (a) A tract of 130 acres on Elm Run in Ritchie county, being part of a larger tract conveyed to me by Cyrus Hall and wife, by deed dated the 4th day of March, 1872, and duly recorded in the office of the clerk of the county court of Ritchie county, on 12 April, 1872, in Deed Book No. 15, pages 429 and 430, the residue of said larger tract having been conveyed by me to John R. Kelly, by deed dated 19th April, 1872, which was duly recorded in said office on the day of its date, in Deed Book No. 15, pages 502 and 503.

"(b) Also my one undivided half of a tract of 2,000 acres on Red creek, in Randolph county, the whole of which was granted to me and Edward L. Thomas, by patent bearing date 31st October, 1883.

"(c) Also my undivided eight-seventeenths interest ($8/17$) in a tract of 8,405 acres of land on Shafer's fork of Cheat river, in Randolph county, which was granted to me and the said Thomas as a tract of 8,000 acres by the state of West Virginia, by patent dated 22nd April, 1872, both of which patents are duly recorded in the said office, one undivided seventeenth of said land having been sold and conveyed to the said Walcott by me and said Thomas by deed dated 20 October, 1893.

"To have and to hold said three tracts of land situate in West Virginia unto Frank Woods, trustee, in fee simple, upon trust nevertheless to sell and dispose of said lands at public or private sale, upon the best possible terms, and for the best possible prices and pay over the proceeds of such sale, less taxes paid by him, and the expenses incident to such sale including a reasonable commission thereon to himself, to the First Spiritualist Church of Baltimore City, a corporation created under the laws of Maryland, and existing in Baltimore City, and I hereby authorize and empower my said trustee to convey said lands to the purchasers thereof by good and sufficient deeds by him duly acknowledged for record, such conveyances to have the same effect in all respects as if executed by me in person.

"(6) I give, devise and bequeath all the rest, residue and remainder of my estate, real and personal and wherever situate to my sister, Mrs. Anna R. Miller."

Woods, as trustee named in the fourth clause of the will, proceeded to sell the realty therein mentioned, and on the 26th day of September, 1899, negotiated a sale to John G. Luke of the undivided $8/17$ of the tract of 8,405 acres of land on Shafer's fork of Cheat river, in Randolph county, at the price of $9 per acre. He filed his report of sale in the circuit court of Baltimore City, which had taken jurisdiction of the administration of his trust. The sale was confirmed and on the 10th day of November, 1899, by formal deed he conveyed this undivided $8/17$ to John G. Luke, who was acting as trustee for the West Virginia Pulp & Paper Company, and who conveyed to it the title so acquired and held in trust, by deed bearing date the 1st day of April, 1904. The aggregate purchase money was $35,597.52; $10,000 being paid to Woods, trustee, on the 10th day of November, 1899, and the residue evidenced by a note for $25,597.52, due and payable one year from date, with interest, which note was promptly paid at maturity. All of this purchase money was paid by the West Virginia Pulp & Paper Company, passed into the hands of the trustee for the uses and purposes set out in the will, and was administered by the trustee under the direction of the circuit court of Baltimore City, Md.

It also appears that, prior to the above-mentioned sale, Woods had sold and disposed of the land in Ritchie county for the sum of $7,000. The Ritchie county land was the property involved in the suit of Mary Virginia Miller v. George H. Ahrens (C. C.) 150 Fed. 644, and Id. (C. C.) 163 Fed. 870, reference to which is made in the decree now appealed from.

Frederick Fickey, Jr., left surviving him, as his next of kin and heirs at law, his sister, Ann Rebecca Miller, the mother of the present plaintiff, and appellee, and another sister, Sarah Elizabeth Hopkins, the former of whom was made residuary legatee under the sixth clause of the will, the latter of whom was entirely ignored.

On or about the 27th day of December, 1899, after the sales above mentioned had been made, Sarah Elizabeth Hopkins filed her caveat and petition in the orphan's court of Baltimore City, praying for the annulment of the probate of the will of the said Fickey upon the grounds of testamentary incapacity, fraud, undue influence, and improper execution. Frank Woods, the executor, answered this petition and caveat, and issues were framed thereon and sent for trial to the superior court of Baltimore City to be tried by a jury.

Pending a trial of these issues, Frank Woods, the executor, died, and Ann Rebecca Miller, the residuary legatee, Amos Musselman, her confidential friend and adviser, and Charles R. Schirm, then president of the First Spiritualist Church of Baltimore City, were, on the 13th day of March, 1901, appointed administrators d. b. n. c. t. a.

On the 20th day of May, 1901, the issues on the caveat came on to be tried; the case having been revived in the name of the administrators c. t. a. as defendants. While the trial was in progress a compromise was negotiated, and it was agreed that the trustee for the First Spiritualist Church should pay the caveator, Sarah Elizabeth Hopkins, $17,500 out of the proceeds of the sale of the land in suit, and that thereupon the various issues upon the caveat should be determined by a verdict in favor of the defendants. The proceeds arising from the sale of this real estate were on deposit in the registry of the circuit court of Baltimore City, which had taken jurisdiction of the administration of the trust estate created by clause 4 of the will; and, in order that the $17,500 might be withdrawn from these funds for the purpose of carrying out the compromise agreement, a petition was drawn and signed by the caveator, Sarah Elizabeth Hopkins, Louise Hopkins Hall, her daughter, Ann R. Miller, the residuary legatee, and Mary Virginia Miller, her daughter, the present appellee, and Charles R. Schirm, president of the First Spiritualist Church.

In this petition the devise to the First Spiritualist Church of Baltimore, a corporation, is recited, the filing of the caveat and the issues thereon, the relationship of Sarah Elizabeth Hopkins and Ann Rebecca Miller to the testator, and their desire that the will in its entirety and the devise to this church should be sustained, and the willingness of the church to pay to Sarah Elizabeth Hopkins the agreed sum of $17,500. The prayer of the petition was that the clerk of the circuit court of Baltimore City might be directed to draw his check to Charles R. Schirm, attorney for the First Spiritualist Church of Baltimore City, for the sum of $17,500.

Such an order was made, check was drawn, and the money delivered to Sarah Elizabeth Hopkins, the caveator, and the suit in that case was dismissed.

This attack upon the will involved the payment of counsel fees and other expenses in its defense, the effect of which was to diminish the residuary estate to Ann Rebecca Miller. It appears that, more than a year after the compromise, counsel for Ann Rebecca Miller approached the counsel for the First Spiritualist Church, and suggested, in view of the extent to which the church had profited under the will, it might see fit to reimburse Ann Rebecca Miller for the moneys paid out in its defense. This was agreed to, and on the 1st day of July, 1902, Charles R. Schirm, counsel for the church, drew his check to the order of Ann R. Miller for $3,200, the same being part and parcel of the fund realized by the church from the sale of the lands in controversy, which was accepted and receipted for by her attorney in the following language:

"Baltimore, July 1, 1902.

"Received of Charles R. Schirm the sum of $3,200.00, being the amount agreed to be paid to Mrs. Ann R. Miller on account of the expenses of defending the will of Frederick Fickey, Jr., and being in full settlement of all claims of every nature, character or description growing out of said estate."

In January, 1903, Ann Rebecca Miller departed this life leaving to survive her as her sole heir at law and likewise her sole legatee and devisee under her will this present plaintiff, her adult daughter, Mary Virginia Miller.

In April and May of that year she writes to the president of the church two letters, suggesting that:

"As the Spiritualist Church was so greatly benefited by my uncle's will, would it not be showing a high appreciation of the gift for the Spiritualist Church to erect a suitable mark to designate the last resting place of its benefactor?"

"My mother and I understood that the bequest to the church was to be a memorial."

On the 23d day of August, 1907, she brings the present suit, seeking, as above stated, to have the devise to the church, and the conveyance made in pursuance of the same, declared null and void, and the title to the land in question to be vested in her as the sole devisee of Ann Rebecca Miller. This was eight years and six months after the probate of the Fickey will; more than six years since the compromise agreement and the payment to Sarah Elizabeth Hopkins of $17,500; more than five years since the payment to her mother by the church of the sum of $3,200, all out of the proceeds of the sale of this real estate.

W. Calvin Chestnut, H. P. Camden, and John W. Davis (Gans & Haman, Davis & Davis, C. F. Moore, Talbott & Hoover, and George E. Nelson, on the brief), for appellants.

Maynard F. Stiles and J. Kemp Bartlett, for appellee.

Before PRITCHARD, Circuit Judge, and KELLER and McDOWELL, District Judges.

PRITCHARD, Circuit Judge. In disposing of the questions involved in this suit, it becomes necessary to determine as to whether the fourth clause of the will constitutes a devise of land. The court below held that it was a devise of land, that as such it was invalid, and, in passing upon the demurrer in the case of Miller v. Ahrens (C. C.) 150 Fed. 644, which raised the identical questions involved in this controversy, clearly states the contention of the plaintiff below as follows:

"On behalf of the plaintiff it is contended that this devise is void: First, because the beneficiary cannot be recognized as having a legal corporate existence by the laws of this state; second, because, aside from its corporate existence, the beneficiary is uncertain; third, because the tract of land sought to be devised exceeds the quantity that may be acquired for a church or religious denomination or body; fourth, because land cannot be taken for a church by trustees by devise; fifth, because the devise is contrary to the public policy of the state."

Notwithstanding the court below held that this was a devise of land to the church, and therefore invalid under the laws of West Virginia, as being against the public policy of that state, it is contended by counsel for appellants that, under the law, all that passed to the First Spiritualist Church by the will was personal property and not real estate; it being insisted that by the terms of the will there was an equitable conversion of the real estate whereby the original form of the property was changed from realty into personalty.

The fourth clause of the will is in the following language:

"I bequeath and devise to my friend Frank Woods, of Baltimore City, trustee, upon the trusts herein set forth, the following three parcels of real estate: * * * To have and to hold said three tracts of land, situate in West Virginia, unto Frank Woods, trustee, in fee simple; upon trust nevertheless to sell and dispose of said lands, at public or private sale, upon the best possible terms and for the best possible prices, and pay over the proceeds of sale, less taxes paid by him and expenses incident to such sale, including a reason-

able commission thereon·to himself, to the First Spiritualist Church of Baltimore City, a corporation created under the laws of Maryland."

The rule invoked by the appellants is thus clearly stated in 3 Pomeroy's Equity Jurisprudence, § 1160:

"The rule is therefore firmly settled that, in order to work a conversion while the property is yet unchanged in form, there must be a clear, imperative direction in the will, deed, or settlement, or a clear imperative agreement in the contract, to convert the property; that is, to sell the land for money or, to lay out the money in the purchase of land. If the act of converting— that is, the act of selling the land, or laying out the money in land—is left to the option, discretion, or choice of the trustees or other parties, then no equitable conversion will take place, because no duty to make the change rests upon them. * * * If, by express language or by a reasonable construction of all of its terms, the instrument shows an intention that the original form of the property shall be changed, then a conversion necessarily takes place."

There was an express direction in this instance that the land should be sold in order that the proceeds of such sale might be applied to the purposes designated therein.

The case of Brown et ux. v. Miller's Ex'rs et al. (decided by the Court of Appeals of West Virginia) 45 W. Va. 211, 31 S. E. 956, is very much in point. In that case the husband, by his will, devised a tract of land to his wife for life, and directed that at her death it should be sold and the proceeds divided among the children. A daughter, Mary J. Brown, owning her tenth, and a share which she had purchased from another child, and her husband, who had purchased interests, so that they owned one-half, filed a bill asking that the tract be partitioned in kind, and not sold as directed in the will, and stated that two sons of the testator, who were executors, refused to allow a partition, and were going to sell the land, and prayed that they be enjoined from selling. The executors demurred to the bill, and upon consideration of the same the court held that the plaintiffs had no right to partition, refused the injunction, and dismissed the bill. The plaintiffs appealed. The Supreme Court, in disposing of the matter, said:

"This is a bill to enforce what is called an 'election.' Have the plaintiffs a right to an election? It is well known that where a will or deed directs land to be sold and converted into money, or money to be invested in land, it operates as a conversion, the land assuming the character of personalty, and the money that of land, before actual conversion, and it passes to those taking under the will or deed as personalty or realty, according as the conversion is from the one to the other. Pratt v. Taliaferro, 3 Leigh, 419. But the party entitled to the beneficial interest may frustrate actual conversion by the exercise of the right of election, under circumstances. Being entitled to the subject, he may take the land or money in its original shape. That excellent late work, American & English Decisions in Equity, in volume 2, in the case of Ingersoll's Estate, at page 76, and elaborate note, fully discusses the subject. * * * The will having thus directed a sale and conversion into money, every child had a right to have a sale, and no one could exercise this right of election without the affirmative consent of all the others. Harcum's Adm'rs v. Hudnall, point 2, 14 Grat. 369, 376; 2 Am. & Eng. Dec. Eq. 95; 2 Lom. Ex'rs, 294. So, without saying whether or not other provisions of this will as to pecuniary legacies would demand a sale, and deny a right of election and partition in kind, the want of consent of all, which must, but does not, appear, will deny partition in kind."

Also, in the cases of Board of Trustees v. Blair, 45 W. Va. 823, 32 S. E. 203, and Lynch v. Spicer, 53 W. Va. 427, 44 S. E. 255, the same doctrine is announced.

In the case of Harcum v. Hudnall, 14 Grat. (Va.) 369, this question was before the Court of Appeals of Virginia, and, in referring to the rule relied upon by appellant's counsel, the court said:

"It is a familiar doctrine that land articled or devised to be sold and converted into money, or money articled or bequeathed to be invested in land, shall assume the very character of the property into which it was to be converted; and, if the new form thus impressed upon it remain unchanged, it will pass to such of the representatives of those who take under the will as would be entitled to it as property of the character into which it was to be converted. And land thus directed to be converted into money will pass as money, although the actual conversion by a sale may not yet have been effected; and, if the will directing the conversion also dispose of the proceeds, the gift of the proceeds is to be considered as a gift of personal estate."

The rule is thus stated in 2 Story's Equity Jurisprudence, where it is said:

"Another class of cases illustrating the doctrine of implied trusts is that which embraces what is commonly called the equitable conversion of property. By this is meant an implied or equitable change of property from real to personal or from personal to real, so that each is considered transferable, transmissible and descendible, according to its new character, as it arises out of the contracts or other acts or intentions of the parties. This change is the mere consequence of the common doctrine of courts of equity that where things are agreed to be done they are to be treated for many purposes as if they were actually done. * * * Land articled to be sold, and turned into money, is reputed money, and money articled or bequeathed to be invested in land is ordinarily deemed to be land."

In the case of McClanachan v. Siter, Price & Co., 2 Grat. (Va.) 280, the court said:

"The subject of the deed was thus converted from realty into personalty, and in its new character the equitable right to it was conferred upon the husband and wife jointly. The husband thereby acquired the power to alien or incumber it without the concurrence of the wife, and, in the event (which has happened) of his surviving her, the whole interest, so far as undisposed of by him, became his absolute property."

There are numerous other cases passed upon by the courts of Virginia and West Virginia, which could be cited in support of this doctrine; but we think we have shown that the principle is well established as a rule of property in those states. This is also the doctrine announced by the courts of Maryland.

The case of Paisley v. Holzshu, 83 Md. 325, 34 Atl. 832, is in harmony with the doctrine announced by the courts of Virginia and West Virginia. In that case, the father executed to his sons a deed for all of his real estate and personal property, in trust for the benefit of the grantor for life, with the provision that he still held a legal estate in the land, and empowered them, after his death, to sell and convey all things conveyed to them by the deed, and then directed the payment of certain gifts therein made by him, and the division into

seven equal parts of the balance remaining; the trustees to share in such parts. The syllabus in that case is as follows:

"Held, that there was a conversion of the realty at the grantor's death, and that the grantees took no such interest in the land as could be reached by levy of execution thereon."

In the case of Boyce v. Kelsoe Home for Orphans of the M. E. Church, 107 Md. 190, 68 Atl. 550, the Maryland court again passed upon this question. There a bill was filed by the executors of James Boyce, deceased, against the Kelsoe Home for Orphans of the M. E. Church et al., legatees under the will of the said Boyce, deceased, for a construction of the will. Later the case was carried to the Court of Appeals, and the court, in the opinion filed, held that there was an equitable conversion under the will; the third syllabus being as follows:

"A testator in his will used the expression 'inasmuch as I shall hereafter give my executors power to sell or lease my real estate and personal estate,' etc., and in the last clause, after appointing his executors, said: 'I confer upon my executors power * * * to make sale * * * of my real estate, * * * not only for the purpose of paying my debts, but to enable them to make the division * * * as hereinbefore provided, it being contemplated by me that they will sell my real estate, though not with undue haste.' Held, that it was his intent that his whole estate, real and personal, should be converted into money."

In the case of Craig v. Leslie et al., 3 Wheat. 563, 4 L. Ed. 460, this question was passed upon by the Supreme Court of the United States. That case grew out of the will of Robert Craig, a citizen of the state of Virginia, and arose in a suit brought on the equity side of the Circuit Court for the District of Virginia, by Thomas Craig, against the trustees named in the will of Robert Craig, to compel them to execute the trusts, by selling the trust estate and paying over the proceeds of the same to the complainant. The clause in the will of Robert Craig upon which the question arose is expressed in the following terms:

"In the first place I give, devise and bequeath unto John Leslie" and four others, "all my estate, real and personal, of which I may die seized or possessed, in any part of America, in special trust, that the aforementioned persons, or such of them as may be living at my death, will sell my personal estate to the highest bidder, on two years credit, and my real estate on one, two and three years credit, provided satisfactory security be given, by bond and deed of trust. In the second place I give and bequeath to my brother, Thos. Craig, of Beith Parish, Ayrshire, Scotland, all the proceeds of my estate, both real and personal, which I have herein directed to be sold, to be remitted to him accordingly as the payments are made, and I hereby declare the aforesaid John Leslie," and four others, "to be my trustees and executors for the purposes aforementioned."

In that case the Attorney General of the state of Virginia filed a cross-bill against the plaintiff in the original suit, and the trustee, the prayer of which was to compel the trustee to sell the trust estate, so far as it consisted of real estate, and to appropriate the proceeds to the use of the said commonwealth, by paying the same into its public treasury.

It was contended that Robert Craig, being an alien, was incapacitated to hold property within the territory of the nation. The court, in discussing the point at issue, among other things, said:

"The incapacity of an alien to take, and to hold beneficially, a legal or equitable estate in real property, is not disputed by the counsel for the plaintiff; and it is admitted by the counsel for the state of Virginia that this incapacity does not extend to personal estate. The only inquiry, then, which this court has to make, is whether the above clause in the will of Robert Craig is to be construed, under all the circumstances of this case, as a bequest to Thomas Craig of personal property, or as a devise of the land itself. * * *

"The settled doctrine of the courts of equity correspond with this obvious construction of wills, as well as of other instruments, whereby land is directed to be turned into money, or money into land, for the benefit of those for whose use the conversion is intended to be made. In the case of Fletcher v. Ashburner, 1 Bro. Cas. 497, the master of the rolls says that 'nothing is better established than this principle that money directed to be employed in the purchase of land, and land directed to be sold and turned into money, are to be considered as that species of property into which they are directed to be converted, and this, in whatever manner the direction is given.' He adds: 'The owner of the fund, or the contracting parties, may make land money, or money land. The cases establish this rule universally.' This declaration is well warranted by the cases to which the master of the rolls refers, as well as by many others. See Dougherty v. Bull, 2 P. Wms. 320; Yeates v. Compton, Id. 358; Trelawney v. Booth, 2 Atk. 307.

"The principle upon which the whole of this doctrine is founded is that a court of equity, regarding the substance and not the mere forms and circumstances of agreements and other instruments, considered things directed or agreed to be done as having been actually performed, where nothing has intervened which ought to prevent a performance. This qualification of the more concise and general rule, that equity considers that to be done which is agreed to be done, will comprehend the cases which come under this head of equity.

"Thus, where the whole beneficial interest in the money in the one case, or in the land in the other, belongs to the person for whose use it is to be given, a court of equity will not compel the trustee to execute the trust against the wishes of the cestui que trust, but will permit him to take the money or the land, if he elect to do so before the conversion has actually been made; and this election he may make, as well by acts or declarations, clearly indicating a determination to that effect, as by application to a court of equity. It is this election, and not the mere right to make it, which changes the character of the estate so as to make it real or personal, at the will of the party entitled to the beneficial interest.

"If this election be not made in time to stamp the property with a character different from that which the will or other instrument gives it, the latter accompanies it, with all its legal consequences, into the hands of those entitled to it in that character. So that in the case of the death of the cestui que trust, without having determined his election, the property will pass to his heirs or personal representatives, in the same manner as it would have done had the trust been executed, and the conversion actually made in his lifetime. * * *

"Equity would surely proceed contrary to its regular course, and the principles which universally govern it, to allow the right of election where it is desired, and can be lawfully made, and yet refuse to decree the money upon the application of the alien, upon no other reason, but because, by law, he is incapable to hold the land. In short, to consider him in the same situation as if he had made an election which would have been refused had he asked for a conveyance. The more just and correct rule would seem to be that, where the cestui que trust is incapable to take or to hold the land beneficially, the right of election does not exist, and, consequently, that the property is to be considered as being of that species into which it is directed to be converted."

The learned judge who heard this cause in the court below, in addition to holding that this was a devise of land, and therefore void under the laws of West Virginia, likewise held that, under the laws of that state, the donee could not take it as personalty, and that, by the provisions of the will, a conversion did not occur. This decision was based upon the theory that the clause of the will in question was void as being against the public policy of that state. This raises the question as to whether there is any law in West Virginia by which the testator was prohibited from disposing of his real property in that state so as to convert the same into personalty to be donated to this church, a resident of the state of Maryland.

The public policy of West Virginia, as evidenced by its constitutional provisions and legislative enactments, is intended to prevent the accumulation of real estate within its domain by churches and religious societies, and is not intended to apply to donations of money or other personal property to churches in other states realized from the sale of real estate situated in that state. The wisdom of legislation of this character, as it affects property within a state, is recognized by all the courts; that it serves a good purpose is admitted by all who had given the question any consideration. We fully appreciate the existence of the evils sought to be remedied by legislation of this character. However, if the state should undertake to legislate so as to control the disposition of personal property in another state realized from the sale of real estate, as in this case, such legislation would be held to be extraterritorial and of no force. To hold that the deed by which this property was conveyed is void because the proceeds resulting from the sale were to be donated to a religious denomination in Maryland would be to establish the rule that the Legislature of West Virginia has the power to direct how the proceeds resulting from the sale of real property situate in that state should be disposed of in another state. That the courts of West Virginia have the power, under her Constitution and laws, to declare donations of real estate to churches in or out of that state void, cannot be controverted; but that question is not before us now. Suppose that during the lifetime of the testator he had conveyed this property in trust, with full power and authority to sell and transfer the property in question for the purpose of raising funds to be donated for the use and benefit of the First Spiritualist Church of the City of Baltimore, Md., and that, in pursuance of such conveyance, the trustee had, during the lifetime of the testator, conveyed the property thus held by him in trust, and paid to the legatee the amount thus realized from such sale, could the state, or any one else, have had the conveyance thus made by the trustee declared void as being against the public policy of West Virginia? We think not. Even if the testator, at the time he made the conveyance, had lived in the state of West Virginia, neither the state, nor any one else, could have had the conveyance declared void as being against the public policy of that state. Such conveyance would not have been in violation of the public policy of that state inasmuch as there would have been no effort to convey real estate in the state of West Virginia to a religious denomination. The execution of the

conveyance to the trustee would simply have been the adoption of a method for converting his real estate into personal property in order to donate the proceeds of such sale to a religious denomination in another state. The evil sought to be remedied by the Legislature of West Virginia was to prevent the holding of real estate in excess of the amount prescribed by law, within its borders by religious denominations. This is the only extent to which it could possibly go. The Legislature of a state can only legislate so as to prevent religious denominations and societies from holding real estate within its territory; and, West Virginia having, in this instance, by constitutional provision and legislative enactment, provided to that effect, such action on the part of the Legislature necessarily applies only to the taking and holding of real estate situate in that state. Here the real estate in question is still held and occupied by citizens of that state, and, as such, is subject to taxation as other property of like character; and the proceeds arising from such sale have been paid into the orphans' court of the state where the testator and the donee resided at the time of the execution of the will, and have been by that court applied according to the directions contained in the clause which authorized the bequest. Of course, if the land in question had been conveyed to the First Spiritualist Church of Baltimore, then we would have an entirely different proposition before us. But such is not the case, and therefore that question does not arise in this controversy, inasmuch as the donee resides in another state, and we know of no law in West Virginia which goes to the extent of preventing a church from accepting personal property as a gift, even if the donee resided in the state of West Virginia. Under these circumstances, we are at a loss to understand upon what theory it can be reasonably contended that the public policy of that state has been violated in any respect in the transfer of this property.

Even if this were a devise of land to a foreign church, the state alone could complain. In the case of Church v. Arkle, 49 W. Va. 93, 38 S. E. 486, the court said:

"Where one leases a lot from the trustees of a church in an action of unlawful detainer against him by such trustees for the recovery of possession, he cannot set up that the church holds the lot in violation of section 1, c. 57, of the Code, limiting the ownership of real estate by a church to such as may be necessary as a place of public worship or burial place, or the residence of a minister. None but the state can attack such ownership as violating that statute." Banks v. Poiteaux, 3 Rand. (Va.) 136, 15 Am. Dec. 706; Hanson v. Little Sisters of the Poor, 79 Md. 434, 32 Atl. 1052, 32 L. R. A. 293.

Also in the case of Jones v. Habersham, 107 U. S. 174, 2 Sup. Ct. 336, 27 L. Ed. 401, the court, in referring to this question, said:

"But there are two conclusive answers to this argument: (1) Restrictions imposed by the charter of a corporation upon the amount of property that it may hold cannot be taken advantage of collaterally by private persons, but only in a direct proceeding by the state which created it. Runyan v. Coster, 14 Pet. 122, 131 [10 L. Ed. 382]; Smith v. Sheeley, 12 Wall. 358, 361 [20 L. Ed. 430]; Bogardus v. Trinity Church, 4 Sandf. Ch. (N. Y.) 633, 758; De Camp v. Dobbins, 29 N. J. Eq. 36; Davis v. Old Colony R. R. Co., 131 Mass. 258, 273 [41 Am. Rep. 221]."

In the case of Julian v. Central Trust Co., 115 Fed. 956, 53 C. C. A. 438, it was insisted that the Southern Railway Company, being a corporation of the state of Virginia, could not hold railroad property in North Carolina, and, in referring to this phase of the question, the court, among other things, said:

"If the Southern Railway Company holds this property contrary to the will of the sovereign power of the state, it is for the state to interfere. No private individual can usurp its prerogative. Bank v. Matthews, 98 U. S. 628, 25 L. Ed. 188; Leazure v. Hillegas, 7 Serg. & R. [Pa.] 313."

In the case of Hickory Farm Oil Co. v. Buffalo, N. Y. & P. R. Co. (C. C.) 32 Fed. 22, the court said:

"The leading case in Pennsylvania on the subject of the effect of a conveyance of real estate to a corporation forbidden by law to 'purchase and hold' the same is that of Leazure v. Hillegas, 7 Serg. & R. [Pa.] 313, in which it was held that such corporation might purchase and take title to the real estate; its title, however, like that of an alien, being defeasible at the pleasure of the commonwealth. That case and the later case of Goundie v. Water Co., 7 Pa. 233, settle the principle that the commonwealth alone can object to a want of capacity in a corporation to hold land."

It is unnecessary, however, to pursue this matter further, inasmuch as we have reached the conclusion that this is not a devise of land but a bequest of personalty.

In the case of Commonwealth v. Martin's Ex'rs, 5 Munf. (Va.) 118, there was a devise of land to the executors with directions that the same be sold and the proceeds paid to aliens. The conveyance in that instance was attacked on behalf of the state upon the ground that aliens were debarred from holding lands in the state of Virginia. The court held that a conversion of the realty into personalty was worked by the will immediately upon the death of the testator, and that the alien legatees were entitled to take as upon a bequest of personalty. In referring to the public policy of that state, the court, among other things, said:

"The question thus presented to us, in which the rights and interests of the commonwealth on the one side, and of alien claimants (under the will of a brother) on the other, come in collision, is one of peculiar interest, delicacy, and importance; and is one in which the court will have no inclination to interfere, to the prejudice of the aliens, unless impelled thereto by the requisitions of the law, bottomed on that principle of self-preservation, inherent as well in society as individuals; that principle which prohibits an alien from holding the soil and territory of our country, to which he holds no reciprocal allegiance.

"The importance to society of that power which is given to individuals of appointing the future heir of their earthly possessions seems to be universally admitted. Those affections which are so necessary to unite and preserve the human family in a state of civilization, and those exertions, whether bodily or mentally, which tend to the convenience, comfort, and ornament of society, depend much on the power of appointing who shall enjoy the fruits of those exertions after the death of the present possessor. To impair this power, therefore, is to lessen the motives to industry, frugality, and every social virtue, and in fact to diminish those endearing affections which so vitally interest as well the happiness as the existence of the social state.

"Hence it happens that all wise governments have carefully preserved to individuals the right of perpetuating to their friends those enjoyments which they have toiled to acquire for themselves; and are solicitous, by law, to

cast the inheritance, where the proprietor dies intestate, on those supposed to be most dear to him. No government has gone farther than ours, in hunting out these objects, being desirous to succeed only where none such can be found, and not to step in before any, wherever they may reside, except to prevent the acquisition, by aliens, of the soil of our country."

Thus we have the public policy of the state of Virginia as applied to cases like the one at bar clearly and forcefully stated by the highest court of that state. In that case the court also said:

"The society then imposes no restraint on her citizens as to the final disposition of their acquisitions, provided it is done in a way not to endanger the community; the next of kin, whether alien or citizen, will succeed, as distributee, to the personal estate, or will take it as legatee; and the question in this case is whether, under the will above recited, the real estate, the soil of the country, passed to aliens, or merely a personal bequest.

"The bill admits that the testator knew that they could not take it as real estate, and that he took advice how he might safely gratify his friendship for them without depriving himself of a home during his life, or violating the above principle of our policy and laws. He might have sold his real estate to a citizen, might have taken a mortgage on it to secure the purchase money, which he might have bequeathed to his sisters. This would have occasioned no injury to the estate. He wishes, though, to enjoy it during his life, and that the same thing should be done, by his executors, after his death, which he might thus have done in his lifetime; and therefore he devises the fee to his executors, who were citizens, with power and directions to make such sale, and to pay over the money."

We think the case of Craig v. Leslie, supra, clearly settles this question. There the court, as we have shown, held that the legacy given to the alien was to be treated as a bequest of personal estate, which he was, although an alien, capable of taking for his own benefit. In referring to this point the court said:

"* * * As in the case of a corporation, so in that of an alien, a bequest of land thus converted into money is valid although a devise of land is or may be void." 3 Pomeroy's Equity Jurisprudence, § 1164, notes 3 and 5.

Also, in the following cases, it is held that the doctrine of equitable conversion is applicable to corporations incapable of taking land by devise: Dodge v. Williams, 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103; Gould v. Asylum, 46 Wis. 106, 50 N. W. 422; American Bible Society v. Noble, 11 Rich. Eq. (S. C.) 201; Draper v. Harvard College, 57 How. Prac. (N. Y.) 273; Downing v. Marshall, 23 N. Y. 366, 80 Am. Dec. 311.

In the case of Downing v. Marshall, supra, the court, among other things, said:

"The Home Missionary Society, being an unincorporated association, is incompetent to take either real or personal estate, and the residuary clauses of the will are so far wholly void.

"The American Tract Society, and the American Bible Society, being corporations without power to take real estate by will, the residuary devise is void as to them, so far as it relates to the rents and profits of the land, or net annual income to arise from carrying on the Ida Mills, as the testator directed.

"But those societies will be entitled to share in the proceeds of the sale and conversion of the said mills and real estate, to be ultimately made, as the will directs. The trusts in their favor are also valid, as to any personal estate embraced therein. * * *

"The distinction between a devise of land and a power to sell for the benefit of another, in respect to the capacity of the donee to take it, is well

settled by authority. The case of Craig v. Leslie, 3 Wheat. 563 [4 L. Ed. 460], and Anstice v. Brown, 6 Paige [N. Y.] 448, hold that where land is devised or conveyed to be sold, and the proceeds paid to an alien, the trust is perfectly valid. It is true that, when these cases arose, a devise or conveyance to an alien was not absolutely void, as devises are now. But I think this makes no difference; the reasoning of the judges in the cases proceeding upon the effect of an equitable conversion, and upon the consideration that the policy of the law which 'forbids aliens from holding was not infringed upon by bequeathing money to them to be raised by the sale of the land pursuant to a power. So in the present case. The policy and language of the statute forbids corporations from holding land by the title of devise; but they are free to take money or personal property by a testamentary gift. To me it seems perfectly consistent, as it certainly is with the language of the statute, to hold that a testator may, by will, create a power to dispose of his lands and pay the proceeds to a legatee."

In the case of Church Extension Society v. Smith, 56 Md. 362, which was a case where there was a devise of land to a foreign religious society, the court, in passing upon this question, said:

"While it may be conceded that a devise of land in Maryland to a foreign religious corporation would be held invalid as against the policy of the law, and contrary to the spirit of the thirty-eighth article of the Declaration of Rights, which is analogous to the British Mortmain acts, yet it by no means follows that where, as in this case, the will directs that the whole estate, real and personal, shall be converted into money, and constitute a blended fund for the purpose of paying debts and legacies, and the whole surplus is disposed of as money; and a pecuniary legacy is given to a foreign religious corporation, any objection can be made to the validity of the legacy because a portion of the fund out of which it is directed to be paid is derived from the sale of real estate.

"In this case there is a clear and manifest intent to disinherit the heir. The whole fund must be considered and treated as money, and the bequest to the foreign religious corporation, not being affected by the provisions of the Declaration of Rights, was rightly held by the circuit court to be a valid bequest."

Notwithstanding the fact that under the Declaration of Rights of the state of Maryland, as will hereafter appear, a religious denomination, in the absence of legislative sanction, would be incapable of taking such a bequest, yet, where real property is disposed of so as to work an equitable conversion, it will be treated as a valid transaction, even though the proceeds realized from such sale are to be given to a foreign religious corporation.

We will now consider briefly the question as to whether this gift to the church was valid as a bequest of money; and this must be determined by the laws of Maryland, the place where the testator, as well as the legatee, were domiciled at the time the will was made. In the case of Jones v. Habersham, 107 U. S. 174, 2 Sup. Ct. 336, 27 L. Ed. 401, the court said:

"According to the uniform course of the decisions of this court, the validity of this devise as against the heirs at law, depend upon the law in the state in which the lands lie, and the validity of the bequest as against the next of kin, upon the law of the state in which the testatrix had her domicile. Vidal v. Girard, 2 How. 127 [11 L. Ed. 205]; Wheeler v. Smith, 9 How. 55 [13 L. Ed. 44]; McDonough v. Murdock, 15 How. 367 [14 L. Ed. 732]; Fontain v. Ravenel, 17 How. 369 [15 L. Ed. 80]; Perin v. Carey, 24 How. 465 [16 L. Ed. 701]; Lorings v. Marsh, 6 Wall. 337 [18 L. Ed. 802]; U. S. v. Fox, 94 U. S. 362 [24 L. Ed. 192]; Russell v. Allen, 107 U. S. 163 [2 Sup. Ct. 327, 27 L. Ed. 397]; Kain v. Gibboney, 101 U. S. 362 [25 L. Ed. 813]."

In the case of Bible Society v. Pendleton, 7 W. Va. 79, the testatrix, Mary Cooper, who was a resident of the state of Virginia, conveyed certain land in Pennsylvania in trust, to be sold, with directions that the proceeds be disposed of "as she may direct." After her death the question arose as to the validity of the bequest, and it was insisted that such question should be decided in the state of Pennsylvania, in which state the lands were situated. The Supreme Court of Virginia held that this money was personal estate, and that the validity of the bequest must be determined according to the laws of the domicile of the testatrix. The court, in passing upon this phase of the question, said:

"The will directs the payment of certain legacies, and simply designates the proceeds of this land as a fund or portion of the personal estate out of which they should be paid. Most manifestly, therefore, the laws of Pennsylvania can have no operation and can have no influence in construing the language of this will, or determining the validity of any of its dispositions touching this fund. They can no more control or determine the direction of this fund than they can control and direct the movements of a stream whose source, indeed, may be within the limits of that state, when it comes to flow exclusively within the limits of Virginia."

In the case of Handley et al. v. Palmer et al., 103 Fed. 39, 43 C. C. A. 100, the Circuit Court of Appeals for the Third Circuit passed upon this question. There, the testator directed that his real estate in Virginia and West Virginia be sold and the proceeds given to the city of Winchester, Va. The court held that there was, or had been, a conversion of the property devised, and that the validity of the bequest should be determined by the courts of the state of Pennsylvania, where the testator was domiciled. Among other things, the court said:

"* * * At the threshold of the discussion of these contentions, it is necessary to inquire what law is applicable to their determination—the law of Pennsylvania or the law of Virginia? As to this we cannot do better than to quote the language of the learned judge below:
" 'It is clear that, as respects all the testator's personal estate and his real estate situated in the state of Pennsylvania, the validity of the residuary clause is to be determined by the law of Pennsylvania; the testator's domicile having been there at the date of his will and at the time of his death. Desesbats v. Berquier, 1 Bin. [Pa.] 336 [2 Am. Dec. 448]; Freeman's Appeal, 68 Pa. 151; Magill v. Brown, Fed. Cas. No. 8,952, Brightly, N. P. 347; Jones v. Habersham, 107 U. S. 174-179, 2 Sup. Ct. 336, 27 L. Ed. 401. In Magill v. Brown, supra, a case relating to bequests to charitable uses under the will of Sarah Zane, Mr. Justice Baldwin, sitting at circuit in this state, held that, the domicile of the testatrix being here, the law of this state governed her real estate situated here, and (curiously enough) sustained a bequest "to the citizens of Winchester," Va., to purchase a fire engine and hose, and a bequest "to the select members belonging to the monthly meeting of women friends, held at Hopewell, Frederick County, Virginia," the interest to be applied "towards the relief of the poor belonging thereto." In Jones v. Habersham, supra, which involved charitable devises and bequests, the Supreme Court of the United States said that the validity of the devises, "as against the heirs at law, depends upon the law of the state in which the land lies, and the validity of the bequests, as against the next of kin, upon the law of the state in which the testatrix had her domicile." It is to be observed that under the will of John Handley no real estate anywhere is devised to the city of Winchester. By the express direction and order of the testator, contained in his will, his entire real estate, wherever lying, is

to be sold by his executors. This direction, by the settled law of Pennsylvania, worked a conversion of the testator's real estate, wherever situated, into personalty, as of the date of his death. Dundas' Appeal, 64 Pa. 325; Roland v. Miller, 100 Pa. 47; Miller v. Com., 111 Pa. 321, 2 Atl. 492; In re Williamson's Estate, 153 Pa. 508, 26 Atl. 246. The plaintiff's counsel, as I understand them, concede that the power of sale given to the executors is mandatory, and worked an equitable conversion of the testator's real estate everywhere, if the residuary clause is valid. In their brief they say: "The property which is subject to the residuary clause or gift (item 28 of will) is to be regarded as personal property, in order to determine the validity of the residuary bequest. * * * If the bequest be held valid, the fund is to be decreed personal property, and passes to the city of Winchester as such. If invalid or void, then, the purpose of the conversion having failed, the conversion of the real estate does not take effect, and the real estate retains its original character for the benefit of the heirs." The plaintiffs' counsel further contends that the question of the validity of the residuary legacy is to be determined mainly by the laws of Virginia.'"

The case of Jones v. Habersham, 107 U. S. 174, 2 Sup. Ct. 336, 27 L. Ed. 401, is very much in point.

The city of Winchester being a resident of the state of Virginia, it became necessary to inquire whether, under the law of that state, it had the power to take the bequest which had been declared valid under the law of the state where the testator resided; and the court, in passing upon that question, held that it had such power.

We now come to consider the question as to whether this bequest is good under the laws of the state of Maryland. Article 38 of the Declaration of Rights, which is a part of the Constitution of the state of Maryland, prohibits devises of bequests to religious societies, orders, or denominations without the prior or subsequent sanction of the Legislature. The Legislature of that state for the year 1900 passed an act giving its sanction and consent to this bequest and devise. Acts 1900, pp. 995, 1005, c. 627. We deem it necessary, however, to only quote sections 1 and 47, which read as follows:

"Section 1. Be it enacted by the General Assembly of the State of Maryland, that the sanction and consent of the said General Assembly be and the same is hereby declared, given and granted to the following gifts, bequests, devises, grants, sales, leases, conveyances and deeds to and from certain persons and bodies corporate to and for the use of certain ministerial persons, religious and educational corporations, orders, denominations or sects, and to certain charitable institutions as herein set forth."

"Sec. 47. To the bequest and devise contained in the last will and testament of Frederick Fickey, Jr., of certain lands in West Virginia to Frank Woods, in trust for the First Spiritual Church of Baltimore City, which will is duly recorded in the office of the register of wills of Baltimore City, in Wills Liber S. R. M., No. 81, folio 467," etc.

The rule in the state of Maryland is very clearly stated in the case of Halsey v. Convention of the Protestant Episcopal Church, 75 Md. 281, 23 Atl. 781. The court, in that case, among other things, said:

"The statute of 43 Elizabeth in regard to charities is not in force in Maryland, but a court of chancery has jurisdiction independent altogether of the statute, to enforce a trust for charitable and religious purposes, provided the devise or bequest be made to a person or body corporate capable of taking and holding the property so devised and bequeathed; and provided, further, the object and character of the trust be definite and certain. When these exist—and the gift is made to one capable of taking it, and when the trust

is declared in definite terms—a court of chancery has the same power to enforce such a trust for charitable and religious purposes as it has to enforce a trust for any other purpose." Erhardt v. Baltimore Friends, 93 Md. 669, 49 Atl. 561; Baptist Church v. Shively, 67 Md. 493, 10 Atl. 244, 1 Am. St. Rep. 412; Crisp v. Crisp, 65 Md. 422, 5 Atl. 421; Barnum v. Baltimore, 62 Md. 292, 50 Am. Rep. 219.

Thus it will be seen that under the laws of Maryland bequests of this character are valid when the consent of the Legislature is obtained —either before or subsequent to the making of the same—and the act of the Legislature authorizing this bequest is plain in its terms, and leaves no doubt that it was the intent of the Legislature that this church should accept the property bequeathed.

This suit was brought solely upon the theory that the will devised lands, and its purpose was to set aside the deeds of purchase as a cloud upon the title of the plaintiffs. It has been legally established that Frederick Fickey, Jr., the testator, had legal capacity to make a will. Therefore he had legal capacity to determine, under the doctrine of equitable conversion, whether he would leave the property in the shape of lands or in the shape of money. By the fourth clause of his will he leaves certain lands to Frank Woods, as trustee, with absolute directions to sell and dispose of the same and to pay the proceeds of such sale to the First Spiritualist Church of Baltimore City. Under the well-established rule, it seems to us that this, in effect, made these lands money; and, whether the ultimate disposition of this bequest could be attacked, a conversion of these lands into personalty was accomplished; for, by reason of the undoubted capacity of the testator, the trustee had a right to make sale of the lands and to convey legal title. However, this is not all. The trustee had, in pursuance of the directions contained in the fourth clause of the will, sold and conveyed these lands long before any question was made, either of his right to do so, or of the entire validity of the bequest of the proceeds of the sale.

The sale of the real estate by the trustee was to a citizen of the state of West Virginia who had a perfect right to purchase and hold the same under the laws of that state, and the proceeds arising therefrom were disposed of by the trustee in the state of Maryland in accordance with the laws of that state.

From what we have said, it necessarily follows that the plaintiff has no equity against the purchasers of the land, but is remitted to any rights she might have against the First Spiritualist Church of Baltimore City for the money received by them.

In Hill on Trustees, 359, it is said that, where there was a devise of real estate to trustees simply (without adding any words of limitation), in trust to sell, the trustee would take the fee by construction. Here, the devise was:

"To have and to hold said three tracts of land situate in West Virginia unto Frank Woods, trustee, in fee simple, upon trust, nevertheless to sell and dispose of said lands at public or private sale, upon the best possible terms and for the best possible prices and pay over the proceeds of such sale, less taxes paid by him, and the expenses incident to such sale including a reasonable commission thereon to himself, to the First Spiritualist Church of Baltimore City, a corporation," etc.

Could any language be more appropriate, both to create a power of sale, and to vest an interest in the trustee? We can conceive of none. Therefore it necessarily follows that, after the execution of this power, no equity would have existed in Ann R. Miller, even in her lifetime, to attack such sale, but only to pursue the proceeds of the sale, inasmuch as the rights of a beneficiary under a will to the right of an equitable election, in any event, determines with her death, that the plaintiff below would have no right to the equity she seeks, even if the lands were as yet unsold; and that, they having been sold long before the death of her mother, she had no semblance of an equity in her bill.

The discussion of the various questions presented in the briefs filed herein has taken a wide range; but, owing to our view of the law of the case, we have not deemed it necessary to discuss many of the points thus presented. However, we have considered with great care the cases relied upon by the appellee to sustain its contention with respect to the points which we have discussed, but are of opinion that they are not controlling in the case at bar. While we have not discussed the other matters that have been so ably presented by counsel, nevertheless we have given them due consideration and are of opinion that in no view of this case would the complainant be entitled to recover.

We think the court below erred in the following particulars:

(a) In decreeing to be illegal, null, and void the devise made by Frederick Fickey, Jr., of the lands in controversy herein to Frank Woods, trustee, for the benefit of the First Spiritualist Church of Baltimore City, and in decreeing that notwithstanding said devise the title of the said land passed by said will to, and vested in, Ann R. Miller, the residuary legatee therein.

(b) In canceling the several conveyances from Frank Woods, trustee, to John G. Luke, and from John G. Luke, trustee, to the defendant West Virginia Pulp & Paper Company; and in perpetually enjoining the defendants from asserting title thereunder to the undivided $8/17$ of the land in controversy, and from disputing the plaintiff's right thereto.

(c) That the court erred in holding that the matters and things presented by the plaintiff's original and amended bills to be proper subjects for equitable jurisdiction.

For the reasons hereinbefore stated, the decree of the court below is reversed, and the cause will be remanded, with instructions to dismiss the bill herein at the cost of the complainant, without prejudice.

Reversed.