In the Matter of the Estate of George Dawson Coleman, deceased. Appeal of Bertram Dawson Coleman.

*Wills—Issue devisavit vel non—Undue influence—Testamentary capacity.*

An application for an issue devisavit vel non will be refused where it appears that the decedent was an educated man, of large property and extravagant habits ; that he and his mother had made their respective wills concurrently in each other's favor eight years before decedent's death ; that they had unusual affection for each other ; that decedent had frequently stated that he had made a will in favor of his mother ; that prior to the making of the will, he had given his mother various powers of attorney ; that one of the subscribing witnesses to the will, after the death of the other witness, and three years after he had certified that the will was legally executed, stated that the data for the will was furnished by the mother ; that the will was not read to the decedent, and was signed by him only after a violent quarrel with her, and this story is contradicted by the proponent, and by the diary of the decedent.

Argued March 29, 1898. Appeal, No. 466, Jan. T., 1897, by Bertram Dawson Coleman, from decree of O. C. Phila. Co., July T., 1892, No. 222, refusing to award an issue devisavit vel non. Before GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Appeal from register of wills.

The facts appear by the opinion of the orphans' court, ASHMAN, J., which was as follows :

The testator and his mother executed their respective wills concurrently, each giving his or her property to the survivor. The contestants are cousins of the testator, and allege that his will was procured by the undue influence of the mother. They base this charge upon two sets of proofs : first, the instruments by which the testator transferred to his mother the control and

finally the ownership of his estate ; and second, the evidence of a subscribing witness to the will.   The estate is large and was derived from testator's father, who devised and bequeathed it to the son for life, with power to appoint by will, and in default of appointment to the issue of the son, and if no issue should survive, then over to the contestants.

The instruments alluded to as having been executed by the son were quite numerous.   They consisted of various powers of attorney to his mother and to the trust company in Pennsylvania, and of letters to his guardian, the purport and purpose of which were the payment of the income of his estate to the mother.   These were all executed after he had attained his majority.   In 1887, at the age of twenty-five years, he conveyed by deed to his mother his estate absolutely ; in 1888, by another deed, he gave her his interest in his father's estate, and in 1889 he conveyed to her by a third deed his estate in Pennsylvania derived from his father.   The consideration named in each conveyance was the payment to him by the mother of the annual sum of 150,000 francs, and of double that amount yearly in case he should marry.   While still a minor he wrote two wills, by which he gave his estate to his mother, and two months after attaining full age he executed the will in controversy.   Plausible reasons were assigned for the multiplicity of these writings, but we propose to treat them just as they stand, so that a fair field shall be open for an inference, on the one hand, that they were the outcome of a scheme by which a designing woman sought to possess herself of the patrimony of her child, or, on the other, that they exhibited the desire of a prudent mother, solicitous for the welfare of a son who was prone to extravagance, to control his fortune in order to preserve it.   If the former inference is the true one, the fraud of the mother was artistically executed, because it left no trace of fraud behind it.   It was denied by the party whom it most deeply affected, in his utterances and, what is more to the purpose, in his acts.   He died while still comparatively young, after a life spent in fashionable folly, but he was by no means an imbecile.   He had been educated as befitted his station ; he spoke two languages ; the one or two letters of his writing which appeared in the evidence were those of an educated gentleman, and he had a force of will which, by common consent, would brook no interference.   His unswerving

statements, made almost promiscuously to his casual acquaint-
ances, his professional advisers and his intimate friends, were
that he detested business; that he made no ventures without
loss; that his mother was prudent; that he had made over to her
his fortune, and that she kept him on a scale which was liberal
without being ruinous. But these declarations, weighty as they
were in rebutting the inference of the mother's fraud, were fee-
ble when compared with the testimony borne by the daily inter-
course between mother and son. In all the reproaches which
were cast by the witnesses upon the character of the proponent,
and even upon her motives, no denial was attempted of her
affection for her son nor of the testator's fondness for her.
Their self-abandonment towards each other was described by
more than one witness as something phenomenal; to quote the
language of one of them, himself a professional man, "Every
time that I had occasion to be with Mrs. Coleman and her son,
I noticed that there was between them a great intimacy and
undoubted affection; the relations of the mother and son also
had this particular element, that there was between them a sort
of companionship; he did not possess for his mother that respect
that certain children have for their parents; his mother was to
him a companion and a confidant in all sorts of things; great
freedom of behavior prevailed, in a word, between the mother
and the son." His love for his parent, indeed, is the key to
the bitter hostility with which he regarded his remaining kin-
dred. He conceived that his mother, while on a visit to this
country, had been treated by one of them with indignity, and
he challenged the offender, who very properly declined the
meeting, to a duel. The wills of the mother and son attested
their mutual regard; the son left his estate to the mother, but
the mother left her estate to the son, if he survived her.

We have scrutinized the evidence carefully and, we believe,
conscientiously, and we are able to say that whatever suspicion
of undue influence it can cast upon the proponent centers in
the testimony of a single witness. Both wills were drawn by
the American consul in Paris; both were executed at the same
time, and both bore the names, as subscribing witnesses, of the
consul and vice-consul. The consul is dead, and the witness
to whom we refer is the vice-consul, Hooper. After the death
of his cowitness, and three years after the date of his own in-

dorsement of the genuineness of the will, he came forward and declared that the notes for the preparation of the will were brought and revised by the mother alone, that the will was not read over to the son, and that, after a violent quarrel between them, the son signed the paper on condition that the mother would fulfil a promise which she appeared to have made. We will not pause to gauge the moral caliber of a witness who practices jugglery of this sort. An eminent English judge did it effectually when he said that such an one deserved the pillory: Walton v. Shelley, 1 Term Rep. 300 ; Lowe v. Jolliffe, 1 W. Bl. 366. It is enough to say that he knew that a fortune of millions rested upon the legality of a document which he himself, under his own hand, had solemnly declared to be genuine, and which he now sought to destroy. The point just here is not whether he is not to be believed, but whether his latest testimony, if true, amounts to anything.

Suppose the mother suggested the provisions of both wills ; the two writings were interchangeable, the donor in each being the universal legatee in the other, and the chances being that the son, as the younger party, would be the survivor. Suppose that the will of the son was not read over to him, the very fact that he hesitated to sign only because a previous promise remained to be ratified would seem to show that he knew the character of the paper and of his own act, and that reading was therefore unnecessary. But the truthfulness of the statement is negatived by the proponent, whose word is at least as good as the vice-consul's, and by the explicit declarations of the testator, in the interest of whose estate they were made. The diary of the testator shows that he called upon the consul with reference to his will nearly two months before the execution of the present will, and in his after-explanations of the transfer of his estate to his mother, he expressly mentioned his will in her favor. The will was deposited with a notary, at whose office the testator had been a frequent visitor, and the clerk of the notary swore that the decedent repeatedly told him that he had made two wills in favor of his mother while he was still a minor, and intended to confirm them by a will when he should come of age. The theory of the contestant is that the will was made under the overshadowing influence of the mother. But the testator certainly emerged from the spell, after crossing the

ocean, and yet, when he consulted counsel in this country as to the mode of escape from an unfortunate marriage, he said nothing about the method of revoking a will which he had been coerced into making.

It is as easy to misapply terms as to misquote scripture. When the will of a testator favors one who in life stood to him in a fiduciary relationship, we instinctively affix to the transaction the stigma of undue influence. That term means an influence which acts to the injury of the person who is swayed by it, or of those whom he would, if left to himself, have benefited.

But what harm was worked to this decedent through the influence of a mother (admitting that it was exerted at all), by which he transferred his property to her in order that it might be preserved, to be transmitted back to him at her death, especially when he uniformly admitted that if it had not been so surrendered, it would infallibly have been wasted? Or how was the contestant injured, when, of all persons living, he was the last who could hope to partake of the testator's bounty? An argument on his behalf has been evolved which has the merit of newness, and which is drawn from the circumstance that he was the party who would take under the will of the father of the testator in default of appointment by the latter. Put in plain language, the argument is, that while a mother may lawfully seek to persuade her son as to the disposition of his own property, she must desist from persuading him as to property over which he has simply a power of disposal. It presupposes a sort of trust in the donee of the power, whereas the very purpose of the power was to give him absolute testamentary sway, absolved from all trusts. So far as the decedent was concerned, it is impossible to conceive of him, or indeed of any testator, drawing any line of distinction, when he came to make his will, between his separate property and his property under a power. The estate came to him from his father, who had given him its use for life, and who had directed that if he should refuse to exercise the power, the property should still go to his issue, and who finally, and only as a last resort, named the contestant as a possible recipient. The argument draws a distinction which is not to be found in the books, between property owned by a testator and property over which he has a general power of appointment; and it is fallacious, because it calls that undue

influence as to one species of property which it admits is legiti-
mate as to the other.  The governing principle in this case is
found in Caldwell v. Anderson, 104 Pa. 199, a decision which
fully recognized the rule of Cuthbertson's Appeal, 97 Pa. 163,
that where a testator is shown to be of weak mind, and the per-
son under whose advice the will has been written, being a stran-
ger to the testator's blood, receives a large testamentary gift,
the burden of proof of the validity of the will is shifted to the
proponent.  But when a relative (in that instance a brother of
the testatrix), who, if she had died intestate, would have re-
ceived a large portion of her estate, draws her will, the legal
presumption is that whatever influence he exerted was legiti-
mate, because it sprang out of his relationship to the giver.  The
present is a stronger case by all the difference between maternal
and fraternal ties; and it is on a direct parallel with the former
in this, that without the will the mother would have been
entitled to a large share of her son's wealth.  In virtue of her
kinship, persuasion on her part, amounting even to importunity,
for a will in her own interest, would not raise a presumption
against her.  But apply to the facts in this case the rule, in all
its severity, which was applied to wholly different facts in Boyd
v. Boyd, 66 Pa. 283, Cuthbertson's Appeal, supra, and Wil-
son's Appeal, 99 Pa. 545.  They were instances of testators
whose wills were written in the extremity of sickness, when the
mind was more or less enfeebled, while here the testator exe-
cuted his will in the full vigor of manhood.  He was a spend-
thrift in the sense that he was extravagant, but he had a large
income with which to gratify his tastes, and there is not a line
in the testimony to show that he had reached a point in his
expenditures at which a court would be justified in treating him
as a spendthrift in the legal meaning of the word.  He had
abundant opportunity of knowing the value of his property from
the accounts rendered by his guardian in France and his trus-
tee in America, and from visits which he made to this state,
where his most valuable realty was situated.  He knew what
disposition he had made of his property, because he repeatedly
declared that he had given it to his mother.  He lived for eight
years after making his will, without an effort to revoke it; and
every day of that period was an affirmance of its provisions.
On this point a text writer says: "It is always the proper

inquiry in regard to undue influence, whether it operated as part of the transaction in making the will in question. And as that is an act always ambulatory during the life of the testator, his conduct after its execution is entitled to some weight in determining its validity : " 1 Redfield on Wills, *526. All of the facts which have been detailed in this connection were distinctly proved by the proponent, and it is hard to see how human testimony could go further.

We cannot adopt, without some limitations, the rule that a jury alone may judge of the credibility of a witness, however the court may be inclined to discredit his statements. To do so would enable us to evade the performance of what, in this instance, has been a most irksome task. The case hangs upon the story told by one man ; and if a jury alone is competent to say whether that narrative was true or false, no matter how overwhelming may be the testimony against it, because they alone can say whether he is a credible witness, our work would have ended before it well began. Suppose a witness had unexpectedly declared upon the witness stand that the testator died a week before the date of this will, would the court send the case at once to a jury to pass upon the credibility of a person whom every circumstance in the case showed to be either a perjurer or a lunatic ? Is there no parallel between the supposititious witness we have described and the actual witness who figures in the evidence ? The vice-consul swore to the difficult, if not the impossible, negative that the testator never approached the consul in relation to the will, except on the one occasion when he executed it; and he swore that the will was not read over to the son, although he admitted his forgetfulness of every incident connected with the will of the mother, which was signed at the same time. He swore also that the mother alone furnished the data for the will. He is contradicted on all of these points by the proponent. He is contradicted on the most material of them by the entry in the son's diary, by his oral statements to the notary's clerk that he was about to make a will, and by his consistent and persistent declarations afterwards that he had made a will, and that it was in favor of his mother. But the worst witness against the vice-counsel is himself ; he is contradicted by an act, perhaps the most solemn in the law, by which, over his own hand, he had certified that the

will was lawfully executed. Must the court ask a jury to say whether a witness is credible when the witness, of his own motion, has confessed that he is not?

We have not overlooked the fact, sworn to by a discarded servant and by the wife from whom the testator at his death was seeking to be divorced, that a will was in the possession of the testator which made a new and different disposition of his property. What were its contents, or whether they had read it, or whether it was a testament at all, they could not say. Such testimony, if listened to, it was said in Linton's Appeal, 104 Pa. 238, "would render useless the precaution of making a will." Nor have we overlooked other testimony given by another witness defamatory of the character of the proponent. We cull one specimen, offensive as it is, to decency, because it shows the animus of the whole. The proponent, it was said by the witness, while seated near her son at the table, said to the company : "This is not my son ; he is my lover." It was a remark (if it was ever uttered) which any mother might playfully and innocently make respecting an only son ; and only an imagination which had battened on putridity could extract from it a suggestion of evil. Yet on the strength of this remark, and on nothing else, the witness swore that the proponent had declared that her son was a bastard and lived with her in incestuous relations. Evidence of this sort could be intended to serve but one purpose ; not to throw light upon the question of undue influence, with which indeed it had nothing to do, but to act upon the prejudices which sometimes creep unbidden into the jury box.

The exceptions to the decree refusing an issue are dismissed.

*Error assigned* was decree of the court.

*John G. Johnson*, with him *John W. Brock*, for appellant.— A confidential relation existed: (1) that of mother; (2) that of guardian from whom the ward had just been emancipated; (3) that of attorney in charge of all the business of the alleged testator. A double relation of confidence existed in the case of the mother: Worrall's App., 110 Pa. 349 ; Clark v. Clark, 174 Pa. 336.

The will was made at the instance of the mother and attorney :

Darlington's Est., 147 Pa. 629; Unruh v. Lukens, 166 Pa. 330; Yardley v. Cuthbertson, 108 Pa. 458.

The burden of disproof of undue influence being thrown upon the mother and attorney, an issue of fact should have been awarded, determinable by a jury. It was for a jury to determine the sufficiency of the evidence offered by her by way of disproof.

In support of the legal presumption of undue influence was the positive testimony of the subscribing witness, who was the only person, other than the mother, who testified as to what took place at the time of execution.

*F. Carroll Brewster*, for appellee.—There is no evidence in this case which would justify the granting of an issue devisavit vel non: Graham's App., 61 Pa. 43; DeHaven's App., 75 Pa. 337; Wainwright's App., 89 Pa. 220; Harrison's App., 100 Pa. 458; Knauss's App., 114 Pa. 10; Eddey's App., 109 Pa. 406; Herster v. Herster, 122 Pa. 239; Levis's Est., 140 Pa. 179; Harvey's Estate, 181 Pa. 214; Cauffman v. Long, 82 Pa. 80, Wood's Est., 13 Phila. 238.

A person who signs his name as witness to a will, by this act of attestation, solemnly testifies to the sanity of the testator. Should such witness afterwards attempt to impeach his own act and to prove that the testator did not know what he was doing when he made (what purported to be) his will, such testimony will be far indeed from conclusive: Walton v. Shelley, 1 Term Rep. 300; Lowe v. Jolliffe, 1 Wm. Bl. 366; Bootle v. Blundell, 19 Vesey, 504; Howard v. Braithwaite, 1 Vesey & Beame, 208; Kinleside v. Harrison, 2 Phillimore, 499; LeBreton v. Fletcher, 2 Hagg. 558; Cook's Est., 16 Phila. 322; Rice's Est., 3 Dist. Rep. 262; Garrison v. Garrison, 15 N. J. Eq. 266; Haynes v. Haynes, 1 Amer. Prob. Rep. 263; Abbott v. Abbott, 1 Amer. Prob. Rep. 326; Dayrell v. Glascock, Skinner's Rep. 413; Dewey v. Dewey, 1 Metc. 349.

There is no evidence of undue influence: McMahon v. Ryan, 20 Pa. 329; Eckert v. Flowry, 43 Pa. 46; Thompson v. Kyner, 65 Pa. 368; Tawney v. Long, 76 Pa. 106; Shaw's Will, 1 W. N. C. 332; Mealey's Est., 3 W. N. C. 370; Stokes v. Miller, 10 W. N. C. 241; Trost v. Dingler, 118 Pa. 270; Constable v. Tufnell, 4 Haggard, 465; Monroe v. Barclay, 93 Amer. Dec.

620; Wingrove v. Wingrove, 55 Law Jour. Rep. (Prob. Div. & Adm. Div.) 7; Pennypacker v. Pennypacker, 8 Atl. Rep. 634; Delgado v. Gonzales, 28 Southwestern Rep. 459; Miller v. Miller, 3 S. & R. 267; Floyd v. Floyd, 49 Amer. Dec. 626; St. Leger's App., 91 Amer. Dec. 735; Higgins v. Carlton, 92 Amer. Dec. 666; Hindman v. Van Dyke, 153 Pa. 243; Bevelot v. Lestrade, 153 Ill. 625; Small v. Small, 4 Me. 220; Rankin v. Rankin, 61 Mo. 295; Hopple's Est., 7 W. N. C. 523; Hughes v. Murtha, 32 N. J. Eq. 288; Martin's Will, 98 N. Y. 197; Lang's Est., 44 Leg. Int. 431; Woodward v. James, 51 Amer. Dec. 649; Trezevant v. Rains, 19 Southwestern Rep. 567; Berberet v. Berberet, 131 Mo. 399; Andrews's Case, 33 N. J. Eq. 514; Caldwell v. Anderson, 104 Pa. 199; Henry v. Hall, 17 Southern Rep. 187; Sharp v. Merriman, 66 Northwestern Rep. 372; Sechrest v. Edwards, 4 Metc. (Ky.) 163; Potter's App., 53 Mich. 106; In re Martin, 98 N. Y. 193; Armstrong v. Armstrong, 63 Wis. 162; Barlow v. Waters, 28 Southwestern Rep. 785; Spratt's Will, 38 N. Y. Supp. 329.

The mutual relations between the testator and the legatee and the warm affection exhibited by each for the other absolutely repel all idea of an undue influence.

PER CURIAM, April 11, 1898:

The opinion of the learned court below contains an exhaustive review of the testimony in this case, and also an accurate and convincing presentation of the reasons which induced the court to refuse the issue applied for. After a careful examination of the opinion and a due consideration of the assignments of error and the arguments of the learned counsel for the appellant, we are not persuaded that there was any error in the conclusion reached. We feel constrained therefore to affirm the decree upon the opinion of the court below.

Decree affirmed and appeal dismissed at the cost of the appellant.