STURM et al. v. STUMP et al.

(District Court, N. D. West Virginia. January 29, 1917.)

1. Deeds ⬤⟿72(1)—"Undue Influence."
    What constitutes "undue influence" as a determining factor must depend upon the peculiar facts and conditions of each case, where it becomes pertinent; but the term carries with it the fundamental idea of an influence which acts to the injury of the person affected by it, or of those whom he would, if left to himself, have benefited, and also, that the influence is sufficiently effective to destroy his free agency.

    [Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 190, 199.

    For other definitions, see Words and Phrases, First and Second Series, Undue Influence.]

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. RELIGIOUS SOCIETIES ☜16—GIFT TO CHURCH CORPORATION—VALIDITY.

   In view of the settled policy of West Virginia, as expressed since the earliest times, by constitutional and statutory enactments adopted from Virginia and continued in force, to restrain the accumulation of property by church organizations, the presumption is against the validity of large gifts to church corporations, to the exclusion of members of the donor's family, and all things relating to them should be closely scrutinized, and they should be set aside, if any appreciable degree of outside undue influence is shown.

   [Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 103–108.]

3. DEEDS ☜72(2)—VALIDITY—GIFT TO CHURCH CORPORATION—UNDUE INFLUENCE.

   A grantor, when 85 years old, made a voluntary conveyance of the larger part of his property, consisting of several hundred acres of land in West Virginia, to the American Baptist Home Mission Society, a New York corporation, the deed to become effective on his death. He had for many years been a Baptist minister, and, while having little education, was a man of strong will and opinions, and an ardent advocate of missions, about which he often preached, and to which he had previously contributed liberally in cash. He had been solicited for a number of years by the state agent of the society to make such a donation by deed or will, and it was suggested that, as the laws of the state did not permit the incorporation of church societies, it be made to the New York corporation, with a request that a share be used locally. The grantor left a daughter, not in very good health or circumstances, and the children of another daughter. *Held* that, if not void as an indirect violation of the laws of the state, the conveyance should be set aside at suit of the heirs as having been obtained through undue influence.

   [Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 197, 198.]

In Equity. Suit by Drusa Sturm and others against John S. Stump and others. Decree for complainants.

Daniel Huffman died in Gilmer county in March, 1916, in his ninety-fourth year of age. He married prior to 1846, and his wife died in 1902. The children of his marriage were two daughters, one of whom, Drusa, married Charles Sturm and is still living; the other married Cary Mollohan, and both she and her husband are dead, leaving children surviving them, Camden D. Mollohan, Josephene Mollohan, Losie Stump, and Darlie Bush. Daniel Huffman was an industrious, frugal farmer and minister of the gospel of the Baptist Church, and accumulated estate, mostly realty, admitted to be worth anywhere from $20,000 to $50,000. In November, 1910, the county court of Gilmer county adjudged him incompetent and appointed a committee to control his person and estate.

On November 11, 1907, Huffman, by deed, conveyed to the American Baptist Home Mission Society 384 acres, 532 acres, 100 acres, 100 acres, and an undivided interest in 10 acres, all lying in Gilmer county; all his interest in all of the oil and gas in and underlying 351 acres in Gilmer county, in and underlying 147 acres and 55 poles, and 175 acres, in Calhoun county, and in and underlying 92½ acres in Braxton county; and all his interest in and to the coal, oil, and gas in, upon, and underlying 92 acres and 48 acres in Gilmer county. By the terms of this deed he reserved the use, possession, and control of these properties, to take and have all rentals for oil and gas accruing from existing leases, to make other leases therefor, and receive all rentals and profits therefrom, for and during his life; and it is set forth that "this deed shall not take effect until after the death of said Huffman." The consideration for this conveyance, set forth on its face, is $1 in hand paid; but in its closing paragraphs it sets forth a purpose on the part of Huffman, by will, to make specific legacies to certain natural persons, and stipulates that,

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

if the other estate of which he died seised proved insufficient to pay such legacies, then the grantee Society should make good all such specific bequests or legacies, to the extent of not exceeding a maximum sum of $4,500, and to secure the fulfillment of this obligation a vendor's lien is retained.

On September 20, 1909, by deed reciting the execution of this former deed to the Mission Society, and setting forth that "a doubt has arisen whether .or not the grantee in the deed aforesaid can take and hold real estate in the manner contemplated by the said deed," Huffman conveys the same land and oil, gas, and coal interests to John S. Stump (who was and is the state agent of the Mission Society), in consideration of $1 in hand paid "and other valuable considerations," to be by Stump "held, used, and disposed of by him according to his own will and discretion, without right on the part of any one to call him to account for the said lands, or interests in lands, or any part thereof, except so far as necessary to make good the charges hereby created." The charges thereby created are then set forth to be the reservation of a life estate in the lands and interests, to receive the rents, issues, and profits thereof for life, and to have any specific legacies bequeathed by the grantor in his will made good to the extent that other property of which he may die seised fails to accomplish that purpose, up to a maximum sum of $4,500, to be paid by grantor's personal representative so soon as the deficit should be ascertained, and to secure such provision a vendor's lien is retained. This deed then closes .with this clause: "It is expressly understood between the parties hereto that this deed is not intended as a repudiation of the deed so made to the American Baptist Home Mission Society, and is only intended to pass title to the grantee herein in the event the first-mentioned shall be held to be void 'and to pass no title."

On June 25, 1912, the Mission Society, by deed, conveyed to said John S. Stump all its right, title, and interest in and to these lands, and coal, oil, and gas interests, in consideration of $1 in hand paid and his note for $10,000, upon conditions that the grantee, Stump, should assume all the obligations, stipulations, and agreements contained in Huffman's deed to the Society; that interest on the $10,000 note should not begin to run until Huffman's death, after which the vendor's lien retained to secure it, upon default in payment, might be enforced by sale of the lands, but such proceeds of sale, whatever amounting to, should release and discharge the note in full. It is further stipulated in this deed that, if the deed of November 11, 1907, to the Society "shall, for any cause, be declared null and void by a court of the state of West Virginia or of the United States, then and in that event "Stump shall 'be released from any payment on account of the debt herein incurred, and said debt shall be deemed to be fully paid and discharged."

On April 11, 1916, after Huffman's death, Stump and wife, in consideration of the sum of $1 in hand paid, other valuable consideration acknowledged to have been received, and the assumption of payment of Stump's $10,000 note to the Mission Society, conveyed all these lands and interests in coal, oil, and gas to the Latin-American Improvement Association, Incorporated, a corporation formed under the provisions of the Business Corporations Law of New York by certificate filed and recorded in the office of the secretary of state, in that state, on August 20, 1915. Its certificate of incorporation sets forth the purpose of the corporation to be to acquire and improve real property, to sell and lease the same in any state in the United States, in Mexico or elsewhere. Its capital stock is limited to $1,000, of 10 shares each, of the par value of $100, 5 of which are subscribed for by the five incorporators, one share each. On the same 11th day of April, 1916, this Latin-American Improvement Association executed to Stump a power of attorney authorizing him to sell these lands and interests and collect the proceeds of sale, proceed at law and equity, employ counsel, and do all things necessary to be done in the premises. For the purpose of assailing and having annulled these several conveyances and this power of attorney, the surviving daughter and the children of Huffman's deceased daughter instituted this suit on May 13, 1916, in the circuit court of Gilmer county. It has been removed to this court upon petitions of the Mission Society and the Improvement Association. Answers have been filed by Stump and the Society, the evidence taken in open court, arguments made, and briefs presented, and the cause submitted for final hearing.

W. E. Haymond and Alex Dulin, both of Sutton, W. Va., and C. M. Bennett and R. F. Kidd, both of Glenville, W. Va., for plaintiffs.

Osman E. Swartz, of Clarksburg, W. Va., W. E. R. Byrne, of Charleston, W. Va., and L. H. Barnett, of Glenville, W. Va., for defendants.

DAYTON, District Judge (after stating the facts as above). The plaintiffs assail these conveyances on several different grounds, based upon both law and fact. It is not denied that their sole design and purpose were to vest in the American Baptist Home Mission Society these lands, or the proceeds that may arise from their sale, and that defendants John S. Stump and the Latin-American Improvement Association have no other interest in the matter, save and except to see this purpose accomplished. Stump is, and has been all the while, a minister of the Baptist Church and the state agent of this Mission Society. The Improvement Association is officered, in part at least, by officers of the Mission Society.

The American Baptist Home Mission Society was organized in New York in 1832. It was first incorporated by act of the Legislature of that state, approved April 12, 1843. Laws N. Y. 1843, c. 117. This original act was subsequently amended by acts approved February 9, 1849 (Laws 1849, c. 35), April 30, 1877 (Laws 1877, c. 196), May 3, 1895 (Laws 1895, c. 528), March 31, 1900 (Laws 1900, c. 260), and April 5, 1902 (Laws 1902, c. 358). The purpose of its incorporation, as set forth in the original act, was that "of promoting the preaching of the gospel in North America." By the amended act of 1849, it was enacted that it should have power to take, by devise or bequest, real or personal property, the clear annual income from which did not exceed $10,000, "provided, no person leaving a wife or child or parent shall devise or bequeath said corporation more than one-fourth of his or her estate, after the payment of his or her debts, and such devise or bequest shall be valid to the extent of such one-fourth, and no such devise or bequest shall be valid in any will which shall not have been made and executed at least two months before the death of the testator." By the last amendment, that of 1902, the power to take real and personal property is enlarged, so that the taking may be by devise, bequest, gift, grant, or purchase, either absolutely or in trust, "subject, however, in respect to the amount of property it may take and hold, to the restrictions and limitations of existing laws, and in respect to devises or bequests from residents of the state of New York, to the provisions of chapter three hundred and sixty of the Laws of eighteen hundred and sixty, entitled 'An act in relation to wills.'" At the time of this amendment, in 1902, the "existing law" of New York, pertinent in the premises, was contained in section 6, chapter 319, of the Act of April 12, 1848, as follows:

"Sec. 6. Any corporation formed under this act shall be capable of taking, holding or receiving any property, real or personal, by virtue of any devise or bequest contained in any last will or testament of any person whatsoever, the clear annual income of which devise or bequest shall not exceed the sum of ten thousand dollars; provided, no person leaving a wife or child or parent, shall devise or bequeath to such institution or corporation more than one-

fourth of his or her estate, after the payment of his or her debts, and such devise or bequest shall be valid to the extent of such one-fourth, and no such devise or bequest shall be valid, in any will which shall not have been made and executed at least two months before the death of the testator."

However, by Act May 15, 1903 (chapter 623, Laws 1903), this section 6 of the act of 1848 was amended by section 19, so as to allow one leaving a wife, child, or parent to devise or bequeath one-half of his estate, after payment of his debts, to such corporations, and this last provision is now incorporated in the 1909 consolidation of Laws, made in New York that year, and appears as section 17, chapter 18, of the Laws of 1909, known as the "Decedent Estate Law." See 1 Birdseye's Consolidated Laws, 945; also see Lefevre v. Lefevre, 59 N. Y. 434, for a discussion of the scope and effect of these general laws upon such corporations, chartered by special legislative act (as was this Mission Society) before their passage.

One of counsel for plaintiffs very ably argues that these conveyances are absolutely void, as contravening article 6, § 47, of the Constitution of the state, forbidding the incorporation of churches and religious denominations. His line of reasoning is to the effect that, if this Mission Society could not be incorporated in the state, then it is not in the power of this state to permit it, as a foreign corporation, to do business and take and hold real estate in this state; that it is in fact a nonentity in this state, and a grant of real estate to it in this state is absolutely void, not voidable; and he cites Runyan v. Coster's Lessee, 14 Pet. 122, 10 L. Ed. 382; United States v. Fox, 94 U. S. 315, 24 L. Ed. 192; Fritts v. Palmer, 132 U. S. 282, 10 Sup. Ct. 93, 33 L. Ed. 317; Bank v. Niles, 1 Doug. (Mich.) 401, 41 Am. Dec. 575; Beach on Corporations, vol. 2, § 411; Id., vol. 1, §§ 164, 335.

To the statement in West Va. Pulp & Paper Co. v. Miller, 176 Fed. 293, 100 C. C. A. 176, that complaint of the devise of land to a foreign church could only be made by the state, he insists (a) that such statement is obiter dictum, as the case did not involve that question, because it was determined there that the land had been converted into personalty; (b) that a clear distinction seems to exist between devises or conveyances of land and bequests or gifts of personalty; and (c) such cases as Jones v. Habersham, 107 U. S. 174, 2 Sup. Ct. 336, 27 L. Ed. 401, are not applicable, because arising in states where religious corporations are not absolutely prohibited, but limited in the extent of their right to take; and to assail an excessive amount taken is only a collateral, and not a direct, attack. Here in this state, he insists, where no power to take at all exists, any conveyance to such church organization, under foreign incorporation, is absolutely void, and constitutes a cloud only upon the title of the heirs which the state, by its laws of descent, has vested in them. If the case was such that the lands, unlawfully taken by a corporation would escheat to the state then he insists the estate alone could complain, but here the conveyances are absolutely void and the lands, by the state's law, has vested in these heirs. In support of this reasoning of counsel, the fact may be cited that the Supreme Court, speaking through Chief Justice Marshall, in Baptist Association v. Hart, 4 Wheat. 1, 4 L. Ed. 499, de-

clared a devise of this kind void at the instance of executors; in Kain v. Gibboney, 101 U. S. 362, 25 L. Ed. 813, speaking through Mr. Justice Strong, it held void a bequest of like character at the instance of a trustee; and in Russel v. Allen, 107 U. S. 167, 2 Sup. Ct. 327, 27 L. Ed. 397, it has in effect said, while it has not taken such action in cases arising from other states, it has done so in Virginia cases, because of its peculiar laws on the subject of such devises and bequests, which laws, it may be said, have been adopted by this state.

.Personally, my views have been in accord with those of counsel in this line of reasoning, as shown by the two opinions filed in Miller v. Ahrens (C. C.) 150 Fed. 644, and (C. C.) 163 Fed. 870; but I hesitate, in view of the opinion rendered in Pulp & Paper Co. v. Miller, supra, by the Circuit Court of Appeals for this circuit, to rely upon them in the decision of this case. But putting aside all other contentions, these plaintiffs assail these conveyances upon another ground— that of undue influence—which merits most careful and thorough consideration.

[1] A discussion of this contention requires consideration (a) of the character and effect of the assailed transactions, (b) of the actors therein, (c) of the source and extent of the influence exerted, and (d) the effect thereof. The term "undue influence" has been variously defined, and still no definition is entirely satisfactory; for, after all has been written and said, its application, as a determining factor, must depend upon the peculiar facts and conditions of each case where it becomes pertinent. 29 Am. & Eng. Encyc. Law (2d Ed.) p. 102. The word "undue" carries with it the fundamental idea that the influence, if effective, has been injurious. In Re Coleman's Estate, 185 Pa. 437, 40 Atl. 69, it is said:

The term undue influence "means an influence which acts to the injury of the person who is swayed by it, or of those whom he would, if left to himself, have benefited."

In Words and Phrases, vol. 8, p. 7166, more than 50 cases are cited in support of the definition: "Undue influence" is the exercise of sufficient control over the person, the validity of whose act is brought in question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised.

These two definitions, taken together, may be adopted as fairly warranting a consideration in detail of the elements I have above set forth. What, then, should be said of the character and effect of these conveyances, or, expressed in other words, in what light are conveyances to a religious corporation by a husband or parent of substantially all his property, for nominally no consideration, leaving wife and children in an impoverished condition to be viewed in law and morals?

[2] In Miller v. Ahrens (C. C.) 150 Fed. 644, I reviewed to a limited extent the fixed determined policy of this state, antagonistic to such conveyances and devises generally to church organizations, expressed in constitutional and legislative enactment, derived from similar ones of the mother state, Virginia, whose people in turn from the start were very sensitive to the evils endured by their ancestors in England from such church aggression, requiring there, as it did, the

enactment of 20 distinct mortmain statutes to correct and stay it. It is true that in West Virginia Pulp & Paper Co. v. Miller, 176 Fed. 284, 100 C. C. A. 176, the result reached in the Ahrens Case, touching Fickey's devise, was reversed on the ground that it was not direct to the church, but to a trustee for its benefit, and the trustee having by sale converted the land into personalty, before suit brought, the remedy was to pursue the sale proceeds. The fixed public policy of the state, as above indicated, however, was not, and cannot be, controverted. It remains perpetuated in the present Constitution of the state, article 6, § 47, absolutely forbidding the granting of a corporation charter to any church or religious denomination, and in sections 1 and 7, chapter 57, of the Code of 1906 (sections 3292 and 3299, Hogg's Code 1913), expressly limiting the holding by churches of real estate for the sole purposes of a place of public worship, a burial place, and a residence for a minister, and restricting such holding for these purposes, to a maximum of 4 acres in any incorporated city, town, or village, and to 60 acres outside thereof.

It is significant in this connection to note, also, that the act of the Legislature of New York, passed in 1849, amending the charter of this Mission Society, expressly limited its power to take, by way of devise or bequest, either real or personal property yielding a net income in excess of $10,000, and forbade any one leaving a wife, child, or parent to devise or bequeath to it property in excess of one-fourth of his estate after payment of his debts, and, as I have shown above, that the general law existing in New York limits the amount to one-half of the estate after payment of debts. Thus it will be seen that sweeping conveyances to church organizations of the kind and character here assailed are against the public policy of the common law, of this state, and, to a degree, of the state of New York, the one granting this society its corporate existence.

But I am constrained to think we may even go a step farther and say they are condemned by the divine law. Upon one occasion, when the Pharisees and Scribes, finding fault with His disciples for their failure to conform in their habits to the traditions of the elders, came to the Savior of the World and asked him, "Why walk not Thy disciples according to the tradition of the elders?" He answered:

"Well hath Esaias prophesied of you hypocrites, as it is written, This people honourth me with their lips but their heart is far from me.

"Howbeit in vain do they worship me, teaching for doctrines the commandments of men.

"For laying aside the commandment of God, ye hold the tradition of men, as the washing of pots and cups: and many other such like things ye do.

"And he said unto them, Full well ye reject the commandment of God, that ye may keep your own tradition.

"For Moses said, Honour thy father and thy mother; and, Whoso curseth father or mother let him die the death:

"But ye say, If a man shall say to his father or mother, It is Corban, that is to say, a gift, by whatsoever thou mightest be profited by me; he shall be free.

"And ye suffer him no more to do aught for his father or his mother;

"Making the word of God of none effect through your tradition, which ye have delivered: and many such like things do ye."

Mark, chapter 7, verses 7 to 13, inclusive; Matthew, chapter 15, verses 3 to 9, inclusive.

Whereby it seems clearly to appear that, if one seeks to discharge the debt of nature, due from him to his parents, by making a gift of his substance to God and religious associations, so as to be unable to support and maintain them, if required, he violates the law of both the Old and New Testament. The inspired Apostle Paul has extended the same doctrine to all family relations when he says:

"But if any provide not for his own, and specially for those of his own house, he hath denied the faith, and is worse than an infidel." 1 Timothy, chapter 5, verse 8.

What conclusions are to be drawn from all this? I think at least these two:

First—That in considering such conveyances and the conditions and circumstances of their execution, no presumptions arise in their favor, but precisely the contrary; that all things relating to them and the causes of their execution should be closely scrutinized, and they should be set aside if any appreciable degree of outside undue influence is shown to have brought about their execution. It must go without saying that courts of equity should never violate the direct precept of the law, nor directly or indirectly attempt to sustain contracts that violate its well settled and defined policy, except in extraordinary and exceptional cases, where great injustice and injury would otherwise result.

Second—That it is distinctly wrong for those who manage and control the operations and efforts of these religious organizations to use any effort or influence to induce the execution of such sweeping conveyances, so condemned by the policy of the law, but, on the contrary, in my judgment, it is their clear moral duty to advise against them and refuse to accept them, where the grantor thereby leaves a wife, child, or parent in an impoverished condition. We may rightly expect Christian men and women to be strict in their observance of both the letter and the policy of the law.

[3] Considering next the actors in these transactions, the evidence clearly shows Huffman to have been a man above the average of his community in both his physical force and mental faculties. In a certain sense he was a fair example of the "warring members" within, the worldly and the spiritual. He was a money maker, able and successful in accumulating much greater property than the average citizen of his community, and very quick to maintain its possession. In the last years of his long life, when memory was failing, he could easily forget his sale contract of timber, but was quick to discover that the timber was being cut, and prompt in seeking to prevent it; he could readily forget his indorsement of the small note for his granddaughter, but prompt in denouncing it as a forgery, when he felt he might have it to pay, regardless of what the consequences to her would have been, if his charge had been true. Other similar incidents in the record evidence could be cited, but these are sufficient. Clearly he was a man of good, hard, business sense and strong of will; at the same time he was a man of no breadth of education or culture.

Many years ago, in his youth, a missionary minister of the Baptist Church "came over the mountains" to preach in Huffman's community,

and Huffman was converted. It is a matter of church history that this Baptist denomination had split largely over this question of missions and missionary work. The Primitive or "Old Side" branch, carrying its Calvinistic creed to the limits of fatalism, denounced it as unnecessary, if not unscriptural, to employ or pay its ministers or to send out missionaries, for "what is to be will be"—those predestined to be saved will be saved, and those predestined to be lost will be lost, regardless of any human effort to the contrary. On the other hand, the adherents of the other branch bitterly repudiated this doctrine, and to accentuate their dissent thereto named themselves the "Missionary" Baptist Church, and, true to their belief in this regard, have always been very active and earnest in missionary effort.

In the days of Huffman's youth, 75 or more years ago, in this section of country, this Baptist denomination was not very particular as to either the secular or theological educational qualifications of its ministers. Under its very democratic form of church government, each particular congregation was a law unto itself, and did very much as it pleased as regards who should or should not preach. Huffman, illiterate as he was, became a minister, and it would seem, from the beginning, was particularly impressed with the importance and necessity of missionary effort. It is testified that it was a continuing practice of his to preach upon this subject particularly, and to refer to himself as "a child of missions," and during his long life he was conspicuous, in his community, for his comparatively large contributions to this cause. As the years went by, he became more and more subject to the compelling force of this influence, until, as the clerk of the county court of his county for 24 years testifies, he became regarded by him as a religious monomaniac, and he drove attorneys out of their office to avoid his discourses on the missionary subject. He stated to different parties, at different times, his fixed purpose to convey or devise his property to this Mission Society.

The evidence is full and complete as to these facts, largely produced by defendants to establish two contentions: First, that of his mental capacity to convey; and, second, that his mental faculties and force of will were too strong to be subject to undue influence. I think the evidence does rebut the contention of senile dementia or incapacity to convey. While he was 85 years old in 1907, and his memory was failing, I do not doubt his ability then to understand to the full degree required by the law, as enunciated in Buckey v. Buckey, 38 W. Va. 168, 18 S. E. 383, and similar cases, the nature and effect of a contract of sale. I cannot agree with the second contention, however, that this evidence proves him to have been too vigorous in mental capacity and too strong of will to be the subject of undue influence. It may be paradoxical, nevertheless it is true, that many men of the highest intellectual powers and the strongest wills are peculiarly subject to just such influence, and become far more dominated and controlled by it than those less mentally strong—men, for example, like Savonarola, Peter the Hermit, and John Brown. It is to be borne in mind that the character and source of the undue influence is immaterial; that it may be exerted by a single individual, or, collectively,

by many. The essential element is that it should be of such power as to control the will and induce a resulting act injurious to the victim himself, or to those whom he would in its absence have benefited.

It seems to me that Huffman from the time he was converted was peculiarly subject to this particular influence. The cause of its inception, whether by the preaching of the pioneers or otherwise, is not disclosed. The first positive evidence of personal effort to induce its consummation is disclosed in the letter written to Huffman on September 12, 1893, by W. E. Powell, who preceded Stump as state agent of this Mission Society. In this letter he says:

"Your kind letter containing two checks, one for $102.93 for State and Home Missions and the other for $2 for your J. and M., has come to hand. Please accept my sincere thanks for your kindness in this. Sorry to see such a falling off. In 1891 your Association gave $130.33, 1892 $99.49, now only $89.38, a loss to our Board of over $40 in two years. The indications now are that we are to have a debt of $800 to $1,000, as against $850 last year. If it is possible for you and Mrs. Huffman to do so, I hope you will send me a good personal gift any time before Oct. 5. A good Baptist made his will last week. Has about $15,000 worth of property and remembered the Home Mission Society. I should be glad if you would deed a good farm to the American Baptist Home Mission Society. You keep and manage it as long as you live, and turn over the rents each year, if you wished to do so. My dear Bro., I hope you will remember both State and Home Missions, but as you cannot convey property by will for State Missions, but can for Home Missions, allow me to urge that you will not put this matter off. It will be too late soon. Please do soon what you wish to do along this line, and let me know about it. Will come up to see you about it, if necessary. Hope to see you at Charleston Oct. 10–13."

This was followed by another letter, under date of January 6, 1894, in which he receipts for $10 sent by Mrs. Huffman, and expresses the belief that Huffman and his wife, "after providing for your children, will want to do a liberal part for the work of our dear Savior by leaving money or property by will," and incloses an exact form of bequest, as prepared by the Home Mission Society, and then says:

"Since our State Mission Board cannot receive and hold legacies under our W. Va. laws, you can will all to the Home Mission Society, with the request that say one-half be for State Mission work in W. Va. Since life is so uncertain, and as making a will does not in any way interfere with the use and control of your property, allow me to urge upon your prayerful attention that you and Mrs. Huffman ask the Lord to direct you in this matter, and that you make your will at the earliest day you can, and that you remember liberally the American Baptist Home Mission Society that has done so much for our beloved country and also for West Virginia Baptists. As soon as you decide about this matter, I shall be glad to hear from you both."

And by still a third, under date of December 6, 1895, in which he says:

"If I should come up to see you about the 20th, will you be ready to close up your will and arrange for the legacy? Would it suit you to deed to the American Baptist Home Mission Society a farm or two? This might be better, than to have it in a will that might be contested. Please let me hear from you."

An analysis of these letters shows that the writer fully understood that, under the law of this state, the State Mission Society was not capable of being incorporated, could not take property, and, under be-

lief that the New York Society could do so, was seeking to evade the law by a devise of all to the one, with suggestion that half be for the use of the other; that he wanted the matter closed up very soon by will or deed, but preferred the latter, as being less liable to be contested (did he fear that the influence might at last fail—Huffman change his mind and revoke the will?); that while he (Huffman) should make provision for his family, he urged him to provide very liberally for the Home Mission Society; and that such provision should embrace "a farm or two." Huffman could not resist these appeals and this influence. On July 10, 1896, he and his wife, for the consideration of $1, by deed conveyed to this Home Mission Society the tract of 532 acres embraced in his home farm and comprising more than half of it, reserving, however, two lots devoted to burial purposes, three other specific acres absolutely, and the timber, coal, oil, and other minerals for their lives, with right to cut the timber and remove the coal, oil, and other minerals. However willingly Mrs. Huffman may have joined in *this* conveyance, it appears from the testimony, that, his contributions continuing, she thought he was going too far, and her mother heart became solicitous for the children. In the fall of 1901, as he was starting to the State Association, she said to him: "Daniel, don't go down and give all we have." On his return she asked him how much he had given, and, when he answered $1,000, she said she did not want him to give it all away—wanted some for the children. He said the reason he gave the $1,000 was because they led him to believe that he was better able to give than any one else at the Association.

Mrs. Huffman died January 3, 1902. Her death and her anxiety about the children seems to have caused, to some extent at least, a weakening of this "missionary" influence over him. The children very naturally were dissatisfied with the conveyance away of the better part of the home farm. In a pathetic letter to John S. Stump, under date of June 16, 1902, he says:

"I am sad and lonely my business is not in bad shape I do not owe but a few dollars I have a good deal due me I am making arrangement with the Home Mishion Bord to by the farm back that I deeded to them if we can get the paper fiset up I will pay them down for it I do not know what I will do in the futer some times think I will try to sell every thing I hav I can tell what would be the best thing is and seteled here I can not tell what time what time may bring fourth. I have not been preaching much since my wife died. I want strate all my bisness up that I can and colleck all I can and against that I can know what I beter do."

He did buy the farm back. On July 1, 1902, by deed, the Society reconveyed it to him, for $1,600 cash. In the deed, assailed here, of November 11, 1907, this farm is a second time conveyed to the Society. Meanwhile Powell had died, and John S. Stump, Huffman's nephew, had been selected his successor as state agent of this Society. He was a minister of the church, able, of strong personality, and very earnest, active, sincere, and zealous in his work for this Society. This is disclosed in his letters adduced in evidence. It is not long until the old influence fully controls Huffman again. He attends State Associations. It is to be remembered that the leading purpose of this

Mission Society is to raise funds with which to pay ministers such parts of their salaries as were not provided for by the localities where they were stationed. In these Associations foregathered many thus provided for. Stump, as agent for the Society, had a hard time to raise funds. The cause was in debt. Huffman could not resist the calls made upon him. He first made a will that has never been probated. Afterwards he adds codicils. Stump aids him in the preparation of these, or some of them. He took custody of the will for about a year. He was working hard to raise funds to pay off the Society's debt and seeking pledges payable upon condition that the whole amount be pledged. He appeals to Huffman by letter to go and see old men in that section, likely to die soon, and get them to pledge contributions, to encourage them to do so by telling them what he (Huffman) had done. Then, realizing that Huffman's provision by will was not available, he says to him:

"Here is another proposition I would like you to think about: If we could get within $700 or $800 of enough pledges to pay that debt, could we not make a change in your gift, so that we could realize enough money on it now to finish up the debt and secure these pledges?"

And he suggests a method of borrowing by which it could be done. Little more need be said. It is undisputed that Stump arranged for the meeting and was present when the deed of November 11, 1907, to the Society, herein assailed, was executed. He secured counsel to prepare it. When Judge Linn, an able lawyer, expressed doubt as to its validity under the laws of this state, he, on behalf of the Society, employed him to prepare and secure from Huffman the deed to himself of September 20, 1909, meant, not for his personal profit, but solely as a device to hold the property for the Society's benefit. He had meanwhile taken from Huffman a broad power of attorney to control his estate. What about the other interested parties, the surviving daughter and the grandchildren? The extent of Huffman's contributions to the Society, independent of these lands conveyed, is not fully disclosed. Checks for $1,600 for the farm bought back, and for $558.80, are exhibited; Huffman stated to his wife he gave $1,000 at the Association, and mention in one of Stump's letters is made of two notes, for $500 each, which it would seem he had borrowed, was ready to pay, and Stump was informing him to whom he could send the checks for such payment. If all these sums were paid to this cause, they aggregate a sum nearly, if not quite, equal to all he has given to these heirs of his. He conveyed to his daughter a tract of land which she sold for $2,000. This was 22 years ago, and some 15 years ago he gave her a check for $720. She is now 60 years of age, living in Alabama on a $1,300 farm, compelled to live in the South, because her health will not allow her to live in this climate.

The earnestness, zeal and marked ability manifested by counsel upon both sides in the conduct of this case, the elaborate arguments made, and the exhaustive briefs filed by them have caused me to give much time and study to the matters involved. To discuss them has to a degree been embarrassing, because of the danger of false impressions arising therefrom. Let it not, for a moment, be assumed that in this

discussion I have meant to reflect upon the honesty, integrity, or sincerity of this church, its ministers, its Mission Society, or its agents. I yield to none in my admiration and affection for this church, its ministers, and its agents for the good they have done and are doing. In their zeal I think they went too far in this matter; as to their integrity and sincerity of purpose, I have no question.

The conclusions I reach are these: I think these conveyances are direct violations of the statute of West Virginia limiting the amount and the purposes for which church organizations may take real estate. If, however, the ruling in West Va. Pulp & Paper Co. v. Miller, supra, is held decisive that only the state can complain of this, I am fully convinced that they should be set aside, at the instance of these heirs, because of the undue influence that caused their execution, and decree to that effect may be entered.

---

⬤⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes